# JEFFERSON PARISH HOSPITAL DISTRICT NO. 2
## ET AL. *v.* HYDE

No. 82–1031.   Argued November 2, 1983—Decided March 27, 1984

STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BRENNAN, J., filed a concurring opinion, in which MARSHALL, J., joined, *post*, p. 32. O'CON-

NOR, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, *post*, p. 32.

*Frank H. Easterbrook* argued the cause for petitioners. With him on the briefs were *Lucas J. Giordano, Thomas J. Reed,* and *Henry S. Allen, Jr.*

*Jerrold J. Ganzfried* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Baxter, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Lipsky, Barry Grossman,* and *Andrea Limmer.*

*John M. Landis* argued the cause for respondent. With him on the brief was *Phillip A. Wittman.* *

JUSTICE STEVENS delivered the opinion of the Court.

At issue in this case is the validity of an exclusive contract between a hospital and a firm of anesthesiologists. We must decide whether the contract gives rise to a *per se* violation of § 1 of the Sherman Act[1] because every patient undergoing

---

*Briefs of *amici curiae* urging reversal were filed for the American Hospital Association by *Richard L. Epstein, Robert W. McCann,* and *John J. Miles;* for the College of American Pathologists by *Jack R. Bierig;* and for the National Association of Private Psychiatric Hospitals by *Joel I. Klein.*

Briefs of *amici curiae* urging affirmance were filed for the American Society of Anesthesiologists, Inc., by *John Landsdale, Jr.,* and *Michael Scott;* for the Association of American Physicians & Surgeons, Inc., by *Kent Masterson Brown;* and for the Louisiana State Medical Society by *Henry B. Alsobrook, Jr., Frank M. Adkins,* and *Richard B. Eason II.*

Briefs of *amici curiae* were filed for the American Association of Nurse Anesthetists by *Phil David Fine, Robert F. Sylvia, Richard E. Verville,* and *Susan M. Jenkins;* and for the Louisiana Hospital Association et al. by *Ricardo M. Guevara.*

[1] Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 26 Stat. 209, as amended, 15 U. S. C. § 1. Respondent has

surgery at the hospital must use the services of one firm of anesthesiologists, and, if not, whether the contract is nevertheless illegal because it unreasonably restrains competition among anesthesiologists.

In July 1977, respondent Edwin G. Hyde, a board-certified anesthesiologist, applied for admission to the medical staff of East Jefferson Hospital. The credentials committee and the medical staff executive committee recommended approval, but the hospital board denied the application because the hospital was a party to a contract providing that all anesthesiological services required by the hospital's patients would be performed by Roux & Associates, a professional medical corporation. Respondent then commenced this action seeking a declaratory judgment that the contract is unlawful and an injunction ordering petitioners to appoint him to the hospital staff.[2] After trial, the District Court denied relief, finding that the anticompetitive consequences of the Roux contract were minimal and outweighed by benefits in the form of improved patient care. 513 F. Supp. 532 (ED La. 1981). The Court of Appeals reversed because it was persuaded that the contract was illegal *"per se."* 686 F. 2d 286 (CA5 1982). We granted certiorari, 460 U. S. 1021 (1983), and now reverse.

I

In February 1971, shortly before East Jefferson Hospital opened, it entered into an "Anesthesiology Agreement" with Roux & Associates (Roux), a firm that had recently been organized by Dr. Kermit Roux. The contract provided that any anesthesiologist designated by Roux would be admitted to the hospital's medical staff. The hospital agreed to

standing to enforce § 1 by virtue of § 4 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 15.

[2] In addition to seeking relief under the Sherman Act, respondent's complaint alleged violations of 42 U. S. C. § 1983 and state law. The District Court rejected these claims. The Court of Appeals passed only on the Sherman Act claim.

provide the space, equipment, maintenance, and other supporting services necessary to operate the anesthesiology department. It also agreed to purchase all necessary drugs and other supplies. All nursing personnel required by the anesthesia department were to be supplied by the hospital, but Roux had the right to approve their selection and retention.[3] The hospital agreed to "restrict the use of its anesthesia department to Roux & Associates and [that] no other persons, parties or entities shall perform such services within the Hospital for the ter[m] of this contract." App. 19.[4]

The 1971 contract provided for a 1-year term automatically renewable for successive 1-year periods unless either party elected to terminate. In 1976, a second written contract was executed containing most of the provisions of the 1971 agreement. Its term was five years and the clause excluding other anesthesiologists from the hospital was deleted;[5] the hospital nevertheless continued to regard itself as committed to a closed anesthesiology department. Only Roux was permitted to practice anesthesiology at the hospital. At the

---

[3] The contract required all of the physicians employed by Roux to confine their practice of anesthesiology to East Jefferson.

[4] Originally Roux agreed to provide at least two full-time anesthesiologists acceptable to the hospital's credentials committee. Roux agreed to furnish additional anesthesiologists as necessary. The contract also provided that Roux would designate one of its qualified anesthesiologists to serve as the head of the hospital's department of anesthesia.

The fees for anesthesiological services are billed separately to the patients by the hospital. They cover the hospital's costs and the professional services provided by Roux. After a deduction of eight percent to provide a reserve for uncollectible accounts, the fees are divided equally between Roux and the hospital.

[5] "Roux testified that he requested the omission of the exclusive language in his 1976 contract because he believes a surgeon or patient is entitled to the services of the anesthesiologist of his choice. He admitted that he and others in his group did work outside East Jefferson following the 1976 contract but felt he was not in violation of the contract in light of the changes made in it." 513 F. Supp. 532, 537 (ED La. 1981).

time of trial the department included four anesthesiologists. The hospital usually employed 13 or 14 certified registered nurse anesthetists.[6]

The exclusive contract had an impact on two different segments of the economy: consumers of medical services, and providers of anesthesiological services. Any consumer of medical services who elects to have an operation performed at East Jefferson Hospital may not employ any anesthesiologist not associated with Roux. No anesthesiologists except those employed by Roux may practice at East Jefferson.

There are at least 20 hospitals in the New Orleans metropolitan area and about 70 percent of the patients living in Jefferson Parish go to hospitals other than East Jefferson. Because it regarded the entire New Orleans metropolitan area as the relevant geographic market in which hospitals compete, this evidence convinced the District Court that East Jefferson does not possess any significant "market power"; therefore it concluded that petitioners could not use the Roux contract to anticompetitive ends.[7] The same evidence led the Court of Appeals to draw a different conclusion. Noting that 30 percent of the residents of the parish go to East Jefferson Hospital, and that in fact "patients tend to choose hospitals by location rather than price or quality," the Court of

---

[6] Approximately 875 operations are performed at the hospital each month; as many as 12 or 13 operating rooms may be in use at one time.

[7] The District Court found:

"The impact on commerce resulting from the East Jefferson contract is minimal. The contract is restricted in effect to one hospital in an area containing at least twenty others providing the same surgical services. It would be a different situation if Dr. Roux had exclusive contracts in several hospitals in the relevant market. As pointed out by plaintiff, the majority of surgeons have privileges at more than one hospital in the area. They have the option of admitting their patients to another hospital where they can select the anesthesiologist of their choice. Similarly a patient can go to another hospital if he is not satisfied with the physicians available at East Jefferson." *Id.*, at 541.

Appeals concluded that the relevant geographic market was the East Bank of Jefferson Parish. 686 F. 2d, at 290. The conclusion that East Jefferson Hospital possessed market power in that area was buttressed by the facts that the prevalence of health insurance eliminates a patient's incentive to compare costs, that the patient is not sufficiently informed to compare quality, and that family convenience tends to magnify the importance of location.[8]

The Court of Appeals held that the case involves a "tying arrangement" because the "users of the hospital's operating rooms (the tying product) are also compelled to purchase the hospital's chosen anesthesia service (the tied product)." *Id.*, at 289. Having defined the relevant geographic market for the tying product as the East Bank of Jefferson Parish, the court held that the hospital possessed "sufficient market power in the tying market to coerce purchasers of the tied product." *Id.*, at 291. Since the purchase of the tied product constituted a "not insubstantial amount of interstate commerce," under the Court of Appeals' reading of our decision in *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 11 (1958), the tying arrangement was therefore illegal *"per se."*[9]

---

[8] While the Court of Appeals did discuss the impact of the contract upon patients, it did not discuss its impact upon anesthesiologists. The District Court had referred to evidence that in the entire State of Louisiana there are 156 anesthesiologists and 345 hospitals with operating rooms. The record does not tell us how many of the hospitals in the New Orleans metropolitan area have "open" anesthesiology departments and how many have closed departments. Respondent, for example, practices with two other anesthesiologists at a hospital which has an open department; he previously practiced for several years in a different New Orleans hospital and, prior to that, had practiced in Florida. The record does not tell us whether there is a shortage or a surplus of anesthesiologists in any part of the country, or whether they are thriving or starving.

[9] The Court of Appeals rejected as "clearly erroneous" the District Court's finding that the exclusive contract was justified by quality considerations. See 686 F. 2d, at 292.

## II

Certain types of contractual arrangements are deemed unreasonable as a matter of law.[10] The character of the restraint produced by such an arrangement is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the arrangement may be found.[11] A price-fixing agreement between competitors is the classic example of such an arrangement. *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 343–348 (1982). It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *"per se."*[12] The rule was first enunciated in *International Salt Co.* v. *United States*, 332 U. S. 392, 396 (1947),[13] and has been en-

[10] "For example, where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with nonmembers of an association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal *per se.*" *United States* v. *Columbia Steel Co.*, 334 U. S. 495, 522–523 (1948) (footnotes omitted).

[11] See, *e. g., Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 49–50 (1977).

[12] The District Court intimated that the principles of *per se* liability might not apply to cases involving the medical profession. 513 F. Supp., at 543–544. The Court of Appeals rejected this approach. 686 F. 2d, at 292–294. In this Court, petitioners "assume" that the same principles apply to the provision of professional services as apply to other trades or businesses. Brief for Petitioners 4, n. 2. See generally *National Society of Professional Engineers* v. *United States*, 435 U. S. 679 (1978).

[13] The roots of the doctrine date at least to *Motion Picture Patents Co.* v. *Universal Film Co.*, 243 U. S. 502 (1917), a case holding that the sale of a patented film projector could not be conditioned on its use only with the patentee's films, since this would have the effect of extending the scope of the patent monopoly. See also *Henry* v. *Dick Co.*, 224 U. S. 1, 70–73 (1912) (White, C. J., dissenting).

dorsed by this Court many times since.[14]  The rule also reflects congressional policies underlying the antitrust laws. In enacting § 3 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 14, Congress expressed great concern about the anticompetitive character of tying arrangements.  See H. R. Rep. No. 627, 63d Cong., 2d Sess., 10–13 (1914); S. Rep. No. 698, 63d Cong., 2d Sess., 6–9 (1914).[15]  While this case

[14] See *United States Steel Corp.* v. *Fortner Enterprises,* 429 U. S. 610, 619–621 (1977); *Fortner Enterprises* v. *United States Steel Corp.,* 394 U. S. 495, 498–499 (1969); *White Motor Co.* v. *United States,* 372 U. S. 253, 262 (1963); *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 330 (1962); *United States* v. *Loew's Inc.,* 371 U. S. 38 (1962); *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958); *Black* v. *Magnolia Liquor Co.,* 355 U. S. 24, 25 (1957); *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 608–609 (1953); *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 305–306 (1949).

[15] See also 51 Cong. Rec. 9072 (1914) (remarks of Rep. Webb); *id.,* at 9084 (remarks of Rep. Madden); *id.,* at 9090 (remarks of Rep. Mitchell); *id.,* at 9160–9164 (remarks of Rep. Floyd); *id.,* at 9184–9185 (remarks of Rep. Helvering); *id.,* at 9409 (remarks of Rep. Gardner); *id.,* at 9410 (remarks of Rep. Mitchell); *id.,* at 9553–9554 (remarks of Rep. Barkley); *id.,* at 14091–14097 (remarks of Sen. Reed); *id.,* at 14094 (remarks of Sen. Walsh); *id.,* at 14209 (remarks of Sen. Shields); *id.,* at 14226 (remarks of Sen. Reed); *id.,* at 14268 (remarks of Sen. Reed); *id.,* at 14599 (remarks of Sen. White); *id.,* at 15991 (remarks of Sen. Martine); *id.,* at 16146 (remarks of Sen. Walsh); Spivack, The Chicago School Approach to Single Firm Exercises of Monopoly Power: A Response, 52 Antitrust L. J. 651, 664–665 (1983).  For example, the House Report on the Clayton Act stated:

"The public is compelled to pay a higher price and local customers are put to the inconvenience of securing many commodities in other communities or through mail-order houses that can not be procured at their local stores.  The price is raised as an inducement.  This is the local effect.  Where the concern making these contracts is already great and powerful, such as the United Shoe Machinery Co., the American Tobacco Co., and the General Film Co., the exclusive or 'tying' contract made with local dealers becomes one of the greatest agencies and instrumentalities of monopoly ever devised by the brain of man.  It completely shuts out competitors, not only from trade in which they are already engaged, but from the opportunities to build up trade in any community where these great and powerful combinations are operating under this system and practice.  By this method and practice the Shoe Machinery Co. has built up a monop-

does not arise under the Clayton Act, the congressional finding made therein concerning the competitive consequences of tying is illuminating, and must be respected.[16]

It is clear, however, that not every refusal to sell two products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, par-

oly that owns and controls the entire machinery now being used by all great shoe-manufacturing houses of the United States. No independent manufacturer of shoe machines has the slightest opportunity to build up any considerable trade in this country while this condition obtains. If a manufacturer who is using machines of the Shoe Machinery Co. were to purchase and place a machine manufacturered by any independent company in his establishment, the Shoe Machinery Co. could under its contracts withdraw all their machinery from the establishment of the shoe manufacturer and thereby wreck the business of the manufacturer. The General Film Co., by the same method practiced by the Shoe Machinery Co. under the lease system, has practically destroyed all competition and acquired a virtual monopoly of all films manufactured and sold in the United States. When we consider contracts of sales made under this system, the result to the consumer, the general public, and the local dealer and his business is even worse than under the lease system." H. R. Rep. No. 627, 63d Cong., 2d Sess., 12–13 (1914).

Similarly, Representative Mitchell said: "[M]onopoly has been built up by these 'tying' contracts so that in order to get one machine one must take all of the essential machines, or practically all. Independent companies who have sought to enter the field have found that the markets have been preempted . . . . The manufacturers do not want to break their contracts with these giant monopolies, because, if they should attempt to install machinery, their business might be jeopardized and all of the machinery now leased by these giant monopolies would be removed from their places of business. No situation cries more urgently for relief than does this situation, and this bill seeks to prevent exclusive 'tying' contracts that have brought about a monopoly, alike injurious to the small dealers, to the manufacturers, and grossly unfair to those who seek to enter the field of competition and to the millions of consumers." 51 Cong. Rec. 9090 (1914).

[16] See generally, e. g., Hodel v. Virginia Surface Mining & Reclamation Assn., 452 U. S. 264, 276–277 (1981); New Orleans v. Dukes, 427 U. S. 297, 303–304 (1976) (per curiam).

ticularly if competing suppliers are free to sell either the entire package or its several parts.[17]   For example, we have written that "if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself." *Northern Pacific R. Co.* v. *United States,* 356 U. S., at 7.[18] Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act.   See *Fortner Enterprises* v. *United States Steel Corp.,* 394 U. S. 495, 517–518 (1969) *(Fortner I)* (WHITE, J., dissenting); *id.,* at 524–525 (Fortas, J., dissenting).

Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.   When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

> "Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take. . . . By conditioning his sale of one commodity on

---

[17] "Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Northern Pacific R. Co.* v. *United States,* 356 U. S., at 6, n. 4.

[18] Thus, we have held that a seller who ties the sale of houses to the provision of credit simply as a way of effectively competing in a competitive market does not violate the antitrust laws.   "The unusual credit bargain offered to Fortner proves nothing more than a willingness to provide cheap financing in order to sell expensive houses." *United States Steel Corp.* v. *Fortner Enterprises,* 429 U. S., at 622 (footnote omitted).

the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the 'tied' product would convince freely choosing buyers to select it over others anyway." *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 605 (1953).[19]

Accordingly, we have condemned tying arrangements when the seller has some special ability—usually called "mar-

---

[19] Accord, *Fortner I,* 394 U. S., at 508–509; *Atlantic Refining Co.* v. *FTC,* 381 U. S. 357, 369–371 (1965); *United States* v. *Loew's Inc.,* 371 U. S., at 44–45; *Northern Pacific R. Co.* v. *United States,* 356 U. S., at 6. For example, JUSTICE WHITE has written:

"There is general agreement in the cases and among commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market. They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers. In addition to these anticompetitive effects in the tied product, tying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line." *Fortner I,* 394 U. S., at 512–514 (dissenting opinion) (footnotes omitted).

ket power"—to force a purchaser to do something that he would not do in a competitive market. See *United States Steel Corp.* v. *Fortner Enterprises*, 429 U. S. 610, 620 (1977) *(Fortner II); Fortner I*, 394 U. S., at 503–504; *United States* v. *Loew's Inc.*, 371 U. S. 38, 45, 48, n. 5 (1962); *Northern Pacific R. Co.* v. *United States*, 356 U. S., at 6–7.[20] When "forcing" occurs, our cases have found the tying arrangement to be unlawful.

Thus, the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures.[21] This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product, *Fortner I*, 394 U. S., at 509,[22] and can in-

---

[20] This type of market power has sometimes been referred to as "leverage." Professors Areeda and Turner provide a definition that suits present purposes. "'Leverage' is loosely defined here as a supplier's power to induce his customer for one product to buy a second product from him that would not otherwise be purchased solely on the merit of that second product." 5 P. Areeda & D. Turner, Antitrust Law ¶ 1134a, p. 202 (1980).

[21] See Report of the Attorney General's National Committee to Study the Antitrust Laws 145 (1955); Craswell, Tying Requirements in Competitive Markets: The Consumer Protection Issues, 62 B. U. L. Rev. 661, 666–668 (1982); Slawson, A Stronger, Simpler Tie-In Doctrine, 25 Antitrust Bull. 671, 676–684 (1980); Turner, The Validity of Tying Arrangements under the Antitrust Laws, 72 Harv. L. Rev. 50, 60–62 (1958).

[22] See 3 Areeda & Turner, *supra* n. 20, ¶ 733e (1978); C. Kaysen & D. Turner, Antitrust Policy 157 (1959); L. Sullivan, Law of Antitrust § 156 (1977); O. Williamson, Markets and Hierarchies: Analysis and Anti-

crease the social costs of market power by facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie, *Fortner II*, 429 U. S., at 617.[23] And from the standpoint of the consumer—whose interests the statute was especially intended to serve—the freedom to select the best bargain in the second market is impaired by his need to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product when they are available only as a package.[24] In sum, to permit restraint of competition on the merits through tying arrangements would be, as we observed in *Fortner II*, to condone "the existence of power that a free market would not tolerate." 429 U. S., at 617 (footnote omitted).

*Per se* condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable.[25] Thus, application of the *per se* rule

---

trust Implications 111 (1975); Pearson, Tying Arrangements and Antitrust Policy, 60 Nw. U. L. Rev. 626, 637–638 (1965).

[23] Sales of the tied item can be used to measure demand for the tying item; purchasers with greater needs for the tied item make larger purchases and in effect must pay a higher price to obtain the tying item. See P. Areeda, Antitrust Analysis ¶ 533 (2d ed. 1974); R. Posner, Antitrust Law 173–180 (1976); Sullivan, *supra* n. 22, § 156; Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19 (1957); Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62 (1960); Dam, Fortner Enterprises v. United States Steel: "Neither a Borrower, Nor a Lender Be," 1969 S. Ct. Rev. 1, 15–16; Ferguson, Tying Arrangements and Reciprocity: An Economic Analysis, 30 Law & Contemp. Prob. 552, 554–558 (1965); Markovits, Tie-Ins, Reciprocity, and the Leverage Theory, 76 Yale L. J. 1397 (1967); Pearson, *supra* n. 22, at 647–653; Sidak, Debunking Predatory Innovation, 83 Colum. L. Rev. 1121, 1127–1131 (1983); Stigler, United States v. Loew's Inc.: A Note on Block-Booking, 1963 S. Ct. Rev. 152.

[24] Especially where market imperfections exist, purchasers may not be fully sensitive to the price or quality implications of a tying arrangement, and hence it may impede competition on the merits. See Craswell, *supra* n. 21, at 675–679.

[25] The rationale for *per se* rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anti-

focuses on the probability of anticompetitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify *per se* condemnation. If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby. See *Fortner I*, 394 U. S., at 501–502; *Northern Pacific R. Co.* v. *United States*, 356 U. S., at 6–7; *Times-Picayune*, 345 U. S., at 608–610; *International Salt*, 332 U. S., at 396. Similarly, when a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

Once this threshold is surmounted, *per se* prohibition is appropriate if anticompetitive forcing is likely. For example, if the Government has granted the seller a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power. *United States* v. *Loew's Inc.*, 371 U. S., at 45–47. Any effort to enlarge the scope of the patent monopoly by using the market power it confers to restrain competition in the market for a second product will undermine competition on the merits in that second market. Thus, the sale or lease of a patented item on condition that the buyer make all his purchases of a separate tied product from the patentee is unlawful. See *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 156–159 (1948); *International Salt*, 332

competitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct. See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 350–351 (1982).

U. S., at 395–396; *International Business Machines Corp.* v. *United States*, 298 U. S. 131 (1936).

The same strict rule is appropriate in other situations in which the existence of market power is probable. When the seller's share of the market is high, see *Times-Picayune Publishing Co.* v. *United States*, 345 U. S., at 611–613, or when the seller offers a unique product that competitors are not able to offer, see *Fortner I*, 394 U. S., at 504–506, and n. 2, the Court has held that the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make *per se* condemnation appropriate. Thus, in *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1 (1958), we held that the railroad's control over vast tracts of western real estate, although not itself unlawful, gave the railroad a unique kind of bargaining power that enabled it to tie the sales of that land to exclusive, long-term commitments that fenced out competition in the transportation market over a protracted period.[26] When, however, the

---

[26] "As pointed out before, the defendant was initially granted large acreages by Congress in the several Northwestern States through which its lines now run. This land was strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense makes it evident that this particular land was often prized by those who purchased or leased it and was frequently essential to their business activities. In disposing of its holdings the defendant entered into contracts of sale or lease covering at least several million acres of land which included 'preferential routing' clauses. The very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power, at least where, as here, no other explanation has been offered for the existence of these restraints. The 'preferential routing' clauses conferred no benefit on the purchasers or lessees. While they got the land they wanted by yielding their freedom to deal with competing carriers, the defendant makes no claim that it came any cheaper than if the restrictive clauses had been omitted. In fact any such price reduction in return for rail shipments would have quite plainly constituted an unlawful rebate to the shipper. So far as the Railroad was concerned its purpose obviously was to fence out competitors, to stifle competition." 356 U. S., at 7–8 (footnote omitted).

18

seller does not have either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market. See *Fortner I*, 394 U. S., at 499–500; *Times-Picayune Publishing Co.* v. *United States*, 345 U. S., at 614–615.

In sum, any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact. Thus, in this case our analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual arrangements with the providers of anesthesiological services. In making that analysis, we must consider whether petitioners are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their patients to accept the tying arrangement.

## III

The hospital has provided its patients with a package that includes the range of facilities and services required for a variety of surgical operations.[27] At East Jefferson Hospital the package includes the services of the anesthesiologist.[28] Petitioners argue that the package does not involve a tying ar-

---

[27] The physical facilities include the operating room, the recovery room, and the hospital room where the patient stays before and after the operation. The services include those provided by staff physicians, such as radiologists or pathologists, and interns, nurses, dietitians, pharmacists, and laboratory technicians.

[28] It is essential to differentiate between the Roux contract and the legality of the contract between the hospital and its patients. The Roux contract is nothing more than an arrangement whereby Roux supplies all of the hospital's needs for anesthesiological services. That contract raises only an exclusive-dealing question, see n. 51, *infra*. The issue here is whether the hospital's insistence that its patients purchase anesthesiological services from Roux creates a tying arrangement.

rangement at all—that they are merely providing a functionally integrated package of services.[29]  Therefore, petitioners contend that it is inappropriate to apply principles concerning tying arrangements to this case.

Our cases indicate, however, that the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items.[30]  In *Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594 (1953), the Court held that a tying arrangement was not present because the arrangement did not link two distinct markets for products that were distinguishable in the eyes of buyers.[31]  In

[29] See generally Dolan & Ralston, Hospital Admitting Privileges and the Sherman Act, 18 Hous. L. Rev. 707, 756–758 (1981); Kissam, Webber, Bigus, & Holzgraefe, Antitrust and Hospital Privileges: Testing the Conventional Wisdom, 70 Calif. L. Rev. 595, 666–667 (1982).

[30] The fact that anesthesiological services are functionally linked to the other services provided by the hospital is not in itself sufficient to remove the Roux contract from the realm of tying arrangements.  We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices.  See *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U. S. 661 (1944) (heating system and stoker switch); *Morton Salt Co.* v. *Suppiger Co.*, 314 U. S. 488 (1942) (salt machine and salt); *International Salt Co.* v. *United States*, 332 U. S. 392 (1947) (same); *Leitch Mfg. Co.* v. *Barber Co.*, 302 U. S. 458 (1938) (process patent and material used in the patented process); *International Business Machines Corp.* v. *United States*, 298 U. S. 131 (1936) (tabulators and tabulating punch cards); *Carbice Corp.* v. *American Patents Development Corp.*, 283 U. S. 27 (1931) (ice cream transportation package and coolant); *FTC* v. *Sinclair Refining Co.*, 261 U. S. 463 (1923) (gasoline and underground tanks and pumps); *United Shoe Machinery Co.* v. *United States*, 258 U. S. 451 (1922) (shoe machinery and supplies, maintenance, and peripheral machinery); *United States* v. *Jerrold Electronics Corp.*, 187 F. Supp. 545, 558–560 (ED Pa. 1960) (components of television antennas), aff'd, 365 U. S. 567 (1961) *(per curiam)*.  In fact, in some situations the functional link between the two items may enable the seller to maximize its monopoly return on the tying item as a means of charging a higher rent or purchase price to a larger user of the tying item.  See n. 23, *supra*.

[31] "The District Court determined that the Times-Picayune and the States were separate and distinct newspapers, though published under

*Fortner I*, the Court concluded that a sale involving two independent transactions, separately priced and purchased from the buyer's perspective, was a tying arrangement.[32]   These

single ownership and control.   But that readers consciously distinguished between these two publications does not necessarily imply that advertisers bought separate and distinct products when insertions were placed in the Times-Picayune and the States.   So to conclude here would involve speculation that advertisers bought space motivated by considerations other than customer coverage; that their media selections, in effect, rested on generic qualities differentiating morning from evening readers in New Orleans.   Although advertising space in the Times-Picayune, as the sole morning daily, was doubtless essential to blanket coverage of the local newspaper readership, nothing in the record suggests that advertisers viewed the city's newspaper readers, morning or evening, as other than fungible customer potential.   We must assume, therefore, that the readership 'bought' by advertisers in the Times-Picayune was the selfsame 'product' sold by the States and, for that matter, the Item.

"The factual departure from the 'tying' cases then becomes manifest. The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market.   Here, however, two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant 'tying' product exists (in fact, since space in neither the Times-Picayune nor the States can be bought alone, one may be viewed as 'tying' as the other); no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same."   345 U. S., at 613–614 (footnote omitted).

[32] "There is, at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved.   In the usual sale on credit the seller, a single individual or corporation, simply makes an agreement determining when and how much he will be paid for his product.   In such a sale the credit may constitute such an inseparable part of the purchase price for the item that the entire transaction could be considered to involve only a single product.   It will be time enough to pass on the issue of credit sales when a case involving it actually arises.   Sales such as that are a far cry from the arrangement involved here, where the credit is provided by one corporation on condition that a product be purchased from a separate corporation, and where the borrower contracts to obtain a large sum of money over and above that needed to pay the seller for the physical products purchased. Whatever the standards for determining exactly when a transaction in-

cases make it clear that a tying arrangement cannot exist unless two separate product markets have been linked.

The requirement that two distinguishable product markets be involved follows from the underlying rationale of the rule against tying. The definitional question depends on whether the arrangement may have the type of competitive consequences addressed by the rule.[33] The answer to the question whether petitioners have utilized a tying arrangement must be based on whether there is a possibility that the economic effect of the arrangement is that condemned by the rule against tying—that petitioners have foreclosed competition on the merits in a product market distinct from the market for the tying item.[34] Thus, in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services

volves only a 'single product,' we cannot see how an arrangement such as that present in this case could ever be said to involve only a single product." 394 U. S., at 507 (footnote omitted).

[33] Professor Dam has pointed out that the *per se* rule against tying can be coherent only if tying is defined by reference to the economic effect of the arrangement.

"[T]he definitional question is hard to separate from the question when tie-ins are harmful. Yet the decisions, in adopting the per se rule, have attempted to flee from that economic question by ruling that tying arrangements are presumptively harmful, at least whenever certain nominal threshold standards on power and foreclosure are met. The weakness of the per se methodology is that it places crucial importance on the definition of the practice. Once an arrangement falls within the defined limits, no justification will be heard. But a per se rule gives no economic standards for defining the practice. To treat the definitional question as an abstract inquiry into whether one or two products is involved is thus to compound the weakness of the per se approach." Dam, *supra* n. 23, at 19.

[34] Of course, the Sherman Act does not prohibit "tying"; it prohibits "contract[s] . . . in restraint of trade." Thus, in a sense the question whether this case involves "tying" is beside the point. The legality of petitioners' conduct depends on its competitive consequences, not on whether it can be labeled "tying." If the competitive consequences of this arrangement are not those to which the *per se* rule is addressed, then it should not be condemned irrespective of its label.

to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services.[35]

Unquestionably, the anesthesiological component of the package offered by the hospital could be provided separately and could be selected either by the individual patient or by one of the patient's doctors if the hospital did not insist on including anesthesiological services in the package it offers to its customers. As a matter of actual practice, anesthesiological services are billed separately from the hospital services petitioners provide. There was ample and uncontroverted testimony that patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia, and that the choice of an individual anesthesiologist separate from the choice of a hospital is particularly frequent in respondent's specialty, obstetric anesthesiology.[36] The Dis-

---

[35] This approach is consistent with that taken by a number of lower courts. See *Moore v. Jas. H. Matthews & Co.*, 550 F. 2d 1207, 1214–1215 (CA9 1977); *Siegel v. Chicken Delight, Inc.*, 448 F. 2d 43, 48–49 (CA9 1971), cert. denied, 405 U. S. 955 (1972); *Washington Gas Light Co. v. Virginia Electric & Power Co.*, 438 F. 2d 248, 253 (CA4 1971); *Susser v. Carvel Corp.*, 332 F. 2d 505, 514 (CA2 1964), cert. dism'd, 381 U. S. 125 (1965); *United States v. Mercedes-Benz of North America, Inc.*, 517 F. Supp. 1369, 1379–1381 (ND Cal. 1981); *In re Data General Corp. Antitrust Litigation*, 490 F. Supp. 1089, 1104–1110 (ND Cal. 1980); *Jones v. 247 East Chestnut Properties*, 1975–2 Trade Cases ¶ 60,491, pp. 67,162–67,163 (ND Ill. 1974); *N. W. Controls, Inc. v. Outboard Marine Corp.*, 333 F. Supp. 493, 501–504 (Del. 1971); *Teleflex Industrial Products, Inc. v. Brunswick Corp.*, 293 F. Supp. 107, 109, and n. 6 (ED Pa. 1968). See generally Ross, The Single Product Issue in Antitrust Tying: A Functional Approach, 23 Emory L. J. 963 (1974); Wheeler, Some Observations on Tie-ins, the Single-Product Defense, Exclusive Dealing and Regulated Industries, 60 Calif. L. Rev. 1557, 1558–1567, 1572–1573 (1972); Note, Product Separability: A Workable Standard to Identify Tie-In Arrangements Under the Antitrust Laws, 46 S. Cal. L. Rev. 160 (1972). See also *Fortner I*, 394 U. S., at 525 (Fortas, J., dissenting); Note, Tying Arrangements and the Single Product Issue, 31 Ohio St. L. J. 861 (1970).

[36] Testimony that patients and their physicians frequently do differentiate between hospital services and anesthesiological services, and request

trict Court found that "[t]he provision of anesthesia services is a medical service separate from the other services provided by the hospital." 513 F. Supp., at 540.[37] The Court of Appeals agreed with this finding, and went on to observe: "[A]n anesthesiologist is normally selected by the surgeon, rather than the patient, based on familiarity gained through a working relationship. Obviously, the surgeons who practice at East Jefferson Hospital do not gain familiarity with any anesthesiologists other than Roux and Associates." 686 F. 2d, at 291.[38] The record amply supports the conclusion that consumers differentiate between anesthesiological services and the other hospital services provided by petitioners.[39]

specific anesthesiologists, was provided by Dr. Roux, Tr. 17, 20 (May 15, 1980, afternoon session), Dr. Hyde, id., at 68–69, 72–74 (May 16, 1980), and other anesthesiologists as well, see id., at 64, 87–88 (May 15, 1980, afternoon session) (testimony of Dr. Charles Eckert); id., at 25–30, 33–34 (May 16, 1980) (testimony of Dr. John Adriani). There was no testimony that patients or their surgeons do not differentiate between anesthesiological services and hospital services when making purchasing decisions. As a statistical matter, only 27 percent of anesthesiologists have financial relationships with hospitals. American Medical Association, Socioeconomic Characteristics of Medical Practice: 1983, p. 12 (1983). In this respect anesthesiologists may differ from radiologists, pathologists, and other types of hospital-based physicians (HBPs). "In some respects anesthesiologists are more akin to office-based MDs (particularly surgeons) than other HBPs. Anesthesiologists' outputs are more discrete, and these HBPs are predominantly fee-for-service practitioners who directly provide services to patients." Steinwald, Hospital-Based Physicians: Current Issues and Descriptive Evidence, Health Care Financing Rev. 63, 69 (Summer 1980). See also United States v. American Society of Anesthesiologists, Inc., 473 F. Supp. 147, 150 (SDNY 1979) ("By 1957 the salaried anesthesiologist had become the exception. Anesthesiologists began to establish independent practices and were able to obtain hospital privileges upon the same terms and conditions as other clinicians").

[37] Accordingly, in its conclusions of law the District Court treated the case as involving a tying arrangement. 513 F. Supp., at 542.

[38] Petitioners do not challenge these findings of the District Court and the Court of Appeals.

[39] One of the most frequently cited statements on this subject was made by Judge Van Dusen in United States v. Jerrold Electronics Corp., 187

Thus, the hospital's requirement that its patients obtain necessary anesthesiological services from Roux combined the purchase of two distinguishable services in a single transaction.[40] Nevertheless, the fact that this case involves a re-

---

F. Supp. 545 (ED Pa. 1960), aff'd, 365 U. S. 567 (1961) *(per curiam)*. While this statement was specifically made with respect to § 3 of the Clayton Act, 15 U. S. C. § 14, its analysis is also applicable to § 1 of the Sherman Act, since with respect to the definition of tying the standards used by the two statutes are the same. See *Times-Picayune*, 345 U. S., at 608–609.

"There are several facts presented in this record which tend to show that a community television antenna system cannot properly be characterized as a single product. Others who entered the community antenna field offered all of the equipment necessary for a complete system, but none of them sold their gear exclusively as a single package as did Jerrold. The record also establishes that the number of pieces in each system varied considerably so that hardly any two versions of the alleged product were the same. Furthermore, the customer was charged for each item of equipment and not a lump sum for the total system. Finally, while Jerrold had cable and antennas to sell which were manufactured by other concerns, it only required that the electronic equipment in the system be bought from it." 187 F. Supp., at 559.

The record here shows that other hospitals often permit anesthesiological services to be purchased separately, that anesthesiologists are not fungible in that the services provided by each are not precisely the same, that anesthesiological services are billed separately, and that the hospital required purchases from Roux even though other anesthesiologists were available and Roux had no objection to their receiving staff privileges at East Jefferson. Therefore, the *Jerrold* analysis indicates that there was a tying arrangement here. *Jerrold* also indicates that tying may be permissible when necessary to enable a new business to break into the market. See *id.*, at 555–558. Assuming this defense exists, and assuming it justified the 1971 Roux contract in order to give Roux an incentive to go to work at a new hospital with an uncertain future, that justification is inapplicable to the 1976 contract, since by then Roux was willing to continue to service the hospital without a tying arrangement.

[40] This is not to say that § 1 of the Sherman Act gives a purchaser the right to buy a product that the seller does not wish to offer for sale. A grocer may decide to carry four brands of cookies and no more. If the customer wants a fifth brand, he may go elsewhere but he cannot sue the grocer even if there is no other in town. However, in such a case the cus-

quired purchase of two services that would otherwise be purchased separately does not make the Roux contract illegal. As noted above, there is nothing inherently anticompetitive about packaged sales. Only if patients are forced to purchase Roux's services as a result of the hospital's market power would the arrangement have anticompetitive consequences. If no forcing is present, patients are free to enter a competing hospital and to use another anesthesiologist instead of Roux.[41] The fact that petitioners' patients are required to purchase two separate items is only the beginning of the appropriate inquiry.[42]

---

tomer is free to purchase no cookies at all, while buying other needed food. If the grocer required the customer to buy an unwanted brand of cookies in order to buy other items which the customer needs and cannot readily obtain elsewhere, then a tying question arises. Cf. *Northern Pacific R. Co.* v. *United States*, 356 U. S., at 7 (grocer selling flour can require customers to also buy sugar only "if its competitors were ready and able to sell flour by itself"). Here, the question is whether patients are forced to use an unwanted anesthesiologist in order to obtain needed hospital services.

[41] An examination of the reason or reasons why petitioners denied respondent staff privileges will not provide the answer to the question whether the package of services they offered to their patients is an illegal tying arrangement. As a matter of antitrust law, petitioners may give their anesthesiology business to Roux because he is the best doctor available, because he is willing to work long hours, or because he is the son-in-law of the hospital administrator without violating the *per se* rule against tying. Without evidence that petitioners are using market power to force Roux upon patients there is no basis to view the arrangement as unreasonably restraining competition whatever the reasons for its creation. Conversely, with such evidence, the *per se* rule against tying may apply. Thus, we reject the view of the District Court that the legality of an arrangement of this kind turns on whether it was adopted for the purpose of improving patient care.

[42] Petitioners argue and the District Court found that the exclusive contract had what it characterized as procompetitive justifications in that an exclusive contract ensures 24-hour anesthesiology coverage, enables flexible scheduling, and facilitates work routine, professional standards, and maintenance of equipment. The Court of Appeals held these findings to be clearly erroneous since the exclusive contract was not necessary to

## IV

The question remains whether this arrangement involves the use of market power to force patients to buy services they would not otherwise purchase. Respondent's only basis for invoking the *per se* rule against tying and thereby avoiding analysis of actual market conditions is by relying on the preference of persons residing in Jefferson Parish to go to East Jefferson, the closest hospital. A preference of this kind, however, is not necessarily probative of significant market power.

Seventy percent of the patients residing in Jefferson Parish enter hospitals other than East Jefferson. 513 F. Supp., at 539. Thus East Jefferson's "dominance" over persons residing in Jefferson Parish is far from overwhelming.[43] The

---

achieve these ends. Roux was willing to provide 24-hour coverage even without an exclusive contract and the credentials committee of the hospital could impose standards for staff privileges that would ensure staff would comply with the demands of scheduling, maintenance, and professional standards. 686 F. 2d, at 292. In the past, we have refused to tolerate manifestly anticompetitive conduct simply because the health care industry is involved. See *Arizona* v. *Maricopa Medical Society*, 457 U. S., at 348–351; *National Gerimedical Hospital* v. *Blue Cross*, 452 U. S. 378 (1981); *American Medical Assn.* v. *United States*, 317 U. S. 519, 528–529 (1943). Petitioners seek no special solicitude. See n. 12, *supra*. We have also uniformly rejected similar "goodwill" defenses for tying arrangements, finding that the use of contractual quality specifications are generally sufficient to protect quality without the use of a tying arrangement. See *Standard Oil Co. of California* v. *United States*, 337 U. S., at 305–306; *International Salt Co.* v. *United States*, 332 U. S., at 397–398; *International Business Machines Corp.* v. *United States*, 298 U. S., at 138–140. See generally Comment, Tying Arrangements under the Antitrust Laws: The "Integrity of the Product" Defense, 62 Mich. L. Rev. 1413 (1964). Since the District Court made no finding as to why contractual quality specifications would not protect the hospital, there is no basis for departing from our prior cases here.

[43] In fact its position in this market is not dissimilar from the market share at issue in *Times-Picayune*, which the Court found insufficient as a basis for inferring market power. See 345 U. S., at 611–613. Moreover,

fact that a substantial majority of the parish's residents elect not to enter East Jefferson means that the geographic data do not establish the kind of dominant market position that obviates the need for further inquiry into actual competitive conditions. The Court of Appeals acknowledged as much; it recognized that East Jefferson's market share alone was insufficient as a basis to infer market power, and buttressed its conclusion by relying on "market imperfections"[44] that permit petitioners to charge noncompetitive prices for hospital services: the prevalence of third-party payment for health care costs reduces price competition, and a lack of adequate information renders consumers unable to evaluate the quality of the medical care provided by competing hospitals. 686 F. 2d, at 290.[45] While these factors may generate "market power" in some abstract sense,[46] they do not generate the kind of market power that justifies condemnation of tying.

Tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made. A lack of price or quality

---

in other antitrust contexts this Court has found that market shares comparable to that present here do not create an unacceptable likelihood of anticompetitive conduct. See *United States* v. *Connecticut National Bank,* 418 U. S. 656 (1974); *United States* v. *E. I. du Pont de Nemours & Co.,* 351 U. S. 377 (1956).

[44] The Court of Appeals acknowledged that absent these market imperfections, there was no basis for applying the *per se* rule against tying. "The contract at issue here involved only one hospital out of at least twenty in the area. Under the analysis applied to a truly competitive market, appellant has failed to prove an illegal tying arrangement." 686 F. 2d, at 290.

[45] Congress has found these market imperfections to exist. See *National Gerimedical Hospital* v. *Blue Cross,* 452 U. S., at 388, n. 13, 391–393, and n. 18; 42 U. S. C. §§ 300k, 300k–2(b); H. R. Conf. Rep. No. 96–420, pp. 57–58 (1979); S. Rep. No. 96–96, pp. 52–53 (1979).

[46] As an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market. See *Fortner II,* 429 U. S., at 620; *Fortner I,* 394 U. S., at 503–504.

competition does not create this type of forcing. If consumers lack price consciousness, that fact will not force them to take an anesthesiologist whose services they do not want—their indifference to price will have no impact on their willingness or ability to go to another hospital where they can utilize the services of the anesthesiologist of their choice. Similarly, if consumers cannot evaluate the quality of anesthesiological services, it follows that they are indifferent between certified anesthesiologists even in the absence of a tying arrangement—such an arrangement cannot be said to have foreclosed a choice that would have otherwise been made "on the merits."

Thus, neither of the "market imperfections" relied upon by the Court of Appeals forces consumers to take anesthesiological services they would not select in the absence of a tie. It is safe to assume that every patient undergoing a surgical operation needs the services of an anesthesiologist; at least this record contains no evidence that the hospital "forced" any such services on unwilling patients.[47] The record therefore

---

[47] Nor is there an indication in the record that petitioners' practices have increased the social costs of their market power. Since patients' anesthesiological needs are fixed by medical judgment, respondent does not argue that the tying arrangement facilitates price discrimination. Where variable-quantity purchasing is unavailable as a means to enable price discrimination, commentators have seen less justification for condemning tying. See Dam, *supra* n. 23, at 15–17; Turner, *supra* n. 21, at 67–72. While tying arrangements like the one at issue here are unlikely to be used to facilitate price discrimination, they could have the similar effect of enabling hospitals "to evade price control in the tying product through clandestine transfer of the profit to the tied product. . . ." *Fortner I*, 394 U. S., at 513 (WHITE, J., dissenting). Insurance companies are the principal source of price restraint in the hospital industry; they place some limitations on the ability of hospitals to exploit their market power. Through this arrangement, petitioners may be able to evade that restraint by obtaining a portion of the anesthesiologists' fees and therefore realize a greater return than they could in the absence of the arrangement. This could also have an adverse effect on the anesthesiology market since it is possible that only less able anesthesiologists would be willing to give up

does not provide a basis for applying the *per se* rule against tying to this arrangement.

## V

In order to prevail in the absence of *per se* liability, respondent has the burden of proving that the Roux contract violated the Sherman Act because it unreasonably restrained competition. That burden necessarily involves an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists. This competition takes place in a market that has not been defined. The market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts such as the Roux contract and might be statewide or merely local.[48] There is, however, insufficient evidence in this record to provide a basis for finding that the Roux contract, as it actually operates in the market, has unreasonably restrained compe-

---

part of their fees in return for the security of an exclusive contract. However, there are no findings of either the District Court or the Court of Appeals which indicate that this type of exploitation of market power has occurred here. The Court of Appeals found only that Roux's use of nurse anesthetists increased its and the hospital's profits, but there was no finding that nurse anesthetists might not be used with equal frequency absent the exclusive contract. Indeed, the District Court found that nurse anesthetists are utilized in all hospitals in the area. 513 F. Supp., at 537, 543. Moreover, there is nothing in the record which details whether this arrangement has enhanced the value of East Jefferson's market power or harmed quality competition in the anesthesiology market.

[48] While there was some rather impressionistic testimony that the prevalence of exclusive contracts tended to discourage young doctors from entering the market, the evidence was equivocal and neither the District Court nor the Court of Appeals made any findings concerning the contract's effect on entry barriers. Respondent does not press the point before this Court. It is possible that under some circumstances an exclusive contract could raise entry barriers since anesthesiologists could not compete for the contract without raising the capital necessary to run a hospitalwide operation. However, since the hospital has provided most of the capital for the exclusive contractor in this case, that problem does not appear to be present.

tition. The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist.[49] The evidence indicates that some surgeons and patients preferred respondent's services to those of Roux, but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice.[50]

In sum, all that the record establishes is that the choice of anesthesiologists at East Jefferson has been limited to one of the four doctors who are associated with Roux and therefore have staff privileges.[51] Even if Roux did not have an exclusive contract, the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges. If respondent is admitted to the staff of East Jefferson, the range of choice will be enlarged from

---

[49] While it is true that purchasers may not be fully sensitive to the price or quality implications of a tying arrangement, so that competition may be impeded, see n. 24, *supra*, this depends on an empirical demonstration concerning the effect of the arrangement on price or quality, and the record reveals little if anything about the effect of this arrangement on the market for anesthesiological services.

[50] If, as is likely, it is the patient's doctor and not the patient who selects an anesthesiologist, the doctor can simply take the patient elsewhere if he is dissatisfied with Roux. The District Court found that most doctors in the area have staff privileges at more than one hospital. 513 F. Supp., at 541.

[51] The effect of the contract, of course, has been to remove the East Jefferson Hospital from the market open to Roux's competitors. Like any exclusive-requirements contract, this contract could be unlawful if it foreclosed so much of the market from penetration by Roux's competitors as to unreasonably restrain competition in the affected market, the market for anesthesiological services. See generally *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U. S. 320 (1961); *Standard Oil Co. of California* v. *United States*, 337 U. S. 293 (1949). However, respondent has not attempted to make this showing.

four to five doctors, but the most significant restraints on the patient's freedom to select a specific anesthesiologist will nevertheless remain.[52]  Without a showing of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made.

## VI

Petitioners' closed policy may raise questions of medical ethics,[53] and may have inconvenienced some patients who would prefer to have their anesthesia administered by someone other than a member of Roux & Associates, but it does not have the obviously unreasonable impact on purchasers that has characterized the tying arrangements that this Court has branded unlawful.  There is no evidence that the price, the quality, or the supply or demand for either the "tying product" or the "tied product" involved in this case has been adversely affected by the exclusive contract between Roux and the hospital.  It may well be true that the contract made it necessary for Dr. Hyde and others to practice elsewhere, rather than at East Jefferson.  But there has been no showing that the market as a whole has been affected at all by the contract.  Indeed, as we previously noted, the record tells us very little about the market for the services of an-

---

[52] The record simply tells us little if anything about the effect of this arrangement on price or quality of anesthesiological services.  As to price, the arrangement did not lead to an increase in the price charged to the patient.  686 F. 2d, at 291.  As to quality, the record indicates little more than that there have never been any complaints about the quality of Roux's services, and no contention that his services are in any respect inferior to those of respondent.  Moreover, the self-interest of the hospital, as well as the ethical and professional norms under which it operates, presumably protect the quality of anesthesiological services.  See Joint Commission on Accreditation of Hospitals, Accreditation Manual for Hospitals 3–10, 151–154 (1983).

[53] See App. A to Brief for American Society of Anesthesiologists, Inc., as *Amicus Curiae.*

esthesiologists. Yet that is the market in which the exclusive contract has had its principal impact. There is simply no showing here of the kind of restraint on competition that is prohibited by the Sherman Act. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.[54]

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

As the opinion for the Court demonstrates, we have long held that tying arrangements are subject to evaluation for *per se* illegality under § 1 of the Sherman Act. Whatever merit the policy arguments against this longstanding construction of the Act might have, Congress, presumably aware of our decisions, has never changed the rule by amending the Act. In such circumstances, our practice usually has been to stand by a settled statutory interpretation and leave the task of modifying the statute's reach to Congress. See *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U. S. 752, 769 (1984) (BRENNAN, J., concurring). I see no reason to depart from that principle in this case and therefore join the opinion and judgment of the Court.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, concurring in the judgment.

East Jefferson Hospital, a public hospital governed by petitioners, requires patients to use the anesthesiological services provided by Roux & Associates, as they are the only doctors authorized to administer anesthesia to patients in the hospital. The Court of Appeals found that this arrangement was a tie-in illegal under the Sherman Act. 686 F. 2d 286

---

[54] The claims raised by respondent but not passed upon by the Court of Appeals remain open on remand. See n. 2, *supra*.

(CA5 1982). I concur in the Court's decision to reverse but write separately to explain why I believe the hospital-Roux contract, whether treated as effecting a tie between services provided to patients, or as an exclusive dealing arrangement between the hospital and certain anesthesiologists, is properly analyzed under the rule of reason.

I

Tying is a form of marketing in which a seller insists on selling two distinct products or services as a package. A supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the *tying* product, sugar as the *tied* product. In this case the allegation is that East Jefferson Hospital has unlawfully tied the sale of general hospital services and operating room facilities (the tying service) to the sale of anesthesiologists' services (the tied services). The Court has on occasion applied a *per se* rule of illegality in actions alleging tying in violation of § 1 of the Sherman Act. *International Salt Co.* v. *United States*, 332 U. S. 392 (1947).

Under the usual logic of the *per se* rule, a restraint on trade that rarely serves any purposes other than to restrain competition is illegal without proof of market power or anticompetitive effect. See, *e. g., Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 5 (1958). In deciding whether an economic restraint should be declared illegal *per se*, "[t]he probability that anticompetitive consequences will result from a practice and the severity of those consequences [is] balanced against its procompetitive consequences. Cases that do not fit the generalization may arise, but a *per se* rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them." *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 50, n. 16 (1977). See also *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 351 (1982). Only when there is very little loss to society from banning a re-

straint altogether is an inquiry into its costs in the individual case considered to be unnecessary.

Some of our earlier cases did indeed declare that tying arrangements serve "hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California* v. *United States*, 337 U. S. 293, 305–306 (1949) (dictum). However, this declaration was not taken literally even by the cases that purported to rely upon it. In practice, a tie has been illegal only if the seller is shown to have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product . . . ." *Northern Pacific R. Co.*, 356 U. S., at 6. Without "control or dominance over the tying product," the seller could not use the tying product as "an effectual weapon to pressure buyers into taking the tied item," so that any restraint of trade would be "insignificant." *Ibid.* The Court has never been willing to say of tying arrangements, as it has of price fixing, division of markets, and other agreements subject to *per se* analysis, that they are always illegal, without proof of market power or anticompetitive effect.

The *"per se"* doctrine in tying cases has thus always required an elaborate inquiry into the economic effects of the tying arrangement.[1] As a result, tying doctrine incurs the costs of a rule-of-reason approach without achieving its benefits: the doctrine calls for the extensive and time-consuming economic analysis characteristic of the rule of reason, but then may be interpreted to prohibit arrangements that economic analysis would show to be beneficial. Moreover, the *per se* label in the tying context has generated more confusion

---

[1] This inquiry has been required in analyzing both the prima facie case and affirmative defenses. Most notably, *United States* v. *Jerrold Electronics Corp.*, 187 F. Supp. 545, 559–560 (ED Pa. 1960), aff'd *per curiam*, 365 U. S. 567 (1961), upheld a requirement that buyers of television systems purchase the complete system, as well as installation and repair service, on the grounds that the tie assured that the systems would operate and thereby protected the seller's business reputation.

than coherent law because it appears to invite lower courts to omit the analysis of economic circumstances of the tie that has always been a necessary element of tying analysis.

The time has therefore come to abandon the *"per se"* label and refocus the inquiry on the adverse economic effects, and the potential economic benefits, that the tie may have. The law of tie-ins will thus be brought into accord with the law applicable to all other allegedly anticompetitive economic arrangements, except those few horizontal or quasi-horizontal restraints that can be said to have no economic justification whatsoever.[2] This change will rationalize rather than abandon tie-in doctrine as it is already applied.

## II

Our prior opinions indicate that the purpose of tying law has been to identify and control those tie-ins that have a demonstrable exclusionary impact in the tied-product market, see *Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594, 605 (1953), or that abet the harmful exercise of market power that the seller possesses in the tying product market.[3] Under the rule of reason tying arrangements should be disapproved only in such instances.

Market power in the *tying* product may be acquired legitimately (*e. g.*, through the grant of a patent) or illegitimately (*e. g.*, as a result of unlawful monopolization). In either event, exploitation of consumers in the market for the tying

---

[2] Tying law is particularly anomalous in this respect because arrangements largely indistinguishable from tie-ins are generally analyzed under the rule of reason. For example, the *"per se"* analysis of tie-ins subjects restrictions on a franchisee's freedom to purchase supplies to a more searching scrutiny than restrictions on his freedom to sell his products. Compare, *e. g.*, *Siegel* v. *Chicken Delight, Inc.*, 448 F. 2d 43 (CA9 1971), cert. denied, 405 U. S. 955 (1972), with *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36 (1977). And exclusive contracts that, like tie-ins, require the buyer to purchase a product from one seller are subject only to the rule of reason. See *infra*, at 44–45.

[3] See n. 4, *infra*.

product is a possibility that exists and that may be regulated under § 2 of the Sherman Act without reference to any tying arrangements that the seller may have developed. The existence of a tied product normally does not increase the profit that the seller with market power can extract from sales of the *tying* product. A seller with a monopoly on flour, for example, cannot increase the profit it can extract from flour consumers simply by forcing them to buy sugar along with their flour. Counterintuitive though that assertion may seem, it is easily demonstrated and widely accepted. See, *e. g.*, R. Bork, The Antitrust Paradox 372–374 (1978); P. Areeda, Antitrust Analysis 735 (3d ed. 1981).

Tying may be economically harmful primarily in the rare cases where power in the market for the tying product is used to create *additional* market power in the market for the *tied* product.[4] The antitrust law is properly concerned with

---

[4] Tying might be undesirable in two other instances, but the hospital-Roux arrangement involves neither one.

In a regulated industry a firm with market power may be unable to extract a supercompetitive profit because it lacks control over the prices it charges for regulated products or services. Tying may then be used to extract that profit from sale of the unregulated, tied products or services. See *Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 513 (1969) (WHITE, J., dissenting).

Tying may also help the seller engage in price discrimination by "metering" the buyer's use of the tying product. Cf. *International Business Machines Corp.* v. *United States*, 298 U. S. 131 (1936); *International Salt Co.* v. *United States*, 332 U. S. 392 (1947). Price discrimination may be independently unlawful, see 15 U. S. C. § 13. Price discrimination may, however, *decrease* rather than increase the economic costs of a seller's market power. See, *e. g.*, R. Bork, The Antitrust Paradox 398 (1978); P. Areeda, Antitrust Analysis 608–610 (3d ed. 1981); O. Williamson, Markets and Hierarchies: Analysis and Antitrust Implications 11–13 (1975). *United States Steel Corp.* v. *Fortner Enterprises, Inc.*, 429 U. S. 610, 617 (1977) *(Fortner II)*, did not hold that price discrimination in the form of a tie-in is always economically harmful; that case indicated only that price discrimination may indicate market power in the tying-product market. But there is no need in this case to address the problem of price discrimination facilitated by tying. The discussion herein is aimed only at tying arrangements as to which no price discrimination is alleged.

tying when, for example, the flour monopolist threatens to use its market power to acquire additional power in the sugar market, perhaps by driving out competing sellers of sugar, or by making it more difficult for new sellers to enter the sugar market. But such extension of market power is unlikely, or poses no threat of economic harm, unless the two markets in question and the nature of the two products tied satisfy three threshold criteria.[5]

First, the seller must have power in the tying-product market.[6] Absent such power tying cannot conceivably have any adverse impact in the tied-product market, and can be only procompetitive in the tying-product market.[7] If the

---

[5] Wholly apart from market characteristics, a prerequisite to application of the Sherman Act is an effect on interstate commerce. See, e. g., McLain v. Real Estate Board of New Orleans, 444 U. S. 232, 246 (1980); Burke v. Ford, 389 U. S. 320, 322 (1967). It is not disputed that such an impact is present here.

[6] The Court has failed in the past to define how much market power is necessary, but in the context of this case it is inappropriate to attempt to resolve that question. In International Salt Co. v. United States, supra, the Court assumed that a patent conferred market power and therefore sufficiently established "the tendency of the arrangement to accomplishment of monopoly." Id., at 396. In its next tying case, Times-Picayune Publishing Co. v. United States, 345 U. S. 594 (1953), the Court distinguished International Salt in part by finding that there was no market "dominance," 345 U. S., at 610–613, after a careful consideration of the relevant market. Then, in Northern Pacific R. Co. v. United States, 356 U. S. 1, 6–8, 11 (1958), the Court required only a minimal showing of market power. More recently, in Fortner II, supra, the Court conducted a more extensive analysis of whether the tie was actually an exercise of market power, considering such factors as the size and profitability of the firm seeking to impose the tie, the character of the tying product, and the effects of the tie—the price charged for the products, the number of customers affected, the functional relation between the tied and tying product.

[7] A common misconception has been that a patent or copyright, a high market share, or a unique product that competitors are not able to offer suffices to demonstrate market power. While each of these three factors might help to give market power to a seller, it is also possible that a seller in these situations will have no market power: for example, a patent holder has no market power in any relevant sense if there are close substitutes for the patented product. Similarly, a high market share indicates market

seller of flour has no market power over flour, it will gain none by insisting that its buyers take some sugar as well. See *United States Steel Corp.* v. *Fortner Enterprises, Inc.*, 429 U. S. 610, 620 (1977) *(Fortner II); Fortner Enterprises, Inc.* v. *United States Steel Corp.*, 394 U. S. 495, 503–504 (1969) *(Fortner I); United States* v. *Loew's Inc.*, 371 U. S. 38, 45, 48, n. 5 (1962); *Northern Pacific R. Co.* v. *United States*, 356 U. S., at 6–7.

Second, there must be a substantial threat that the tying seller will acquire market power in the tied-product market. No such threat exists if the tied-product market is occupied by many stable sellers who are not likely to be driven out by the tying, or if entry barriers in the tied-product market are low. If, for example, there is an active and vibrant market for sugar—one with numerous sellers and buyers who do not deal in flour—the flour monopolist's tying of sugar to flour need not be declared unlawful. Cf. *Fortner II, supra,* at 617–618, and n. 8; *Fortner I, supra,* at 498–499; *Times-Picayune Publishing Co.* v. *United States*, 345 U. S., at 611; *Standard Oil Co. of California* v. *United States*, 337 U. S., at 305–306; *International Salt Co.* v. *United States*, 332

---

power only if the market is properly defined to include all reasonable substitutes for the product. See generally Landes & Posner, Market Power in Antitrust Cases, 94 Harv. L. Rev. 937 (1981).

Nor does any presumption of market power find support in our prior cases. Although *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131 (1948), considered the legality of "block-booking" of motion pictures, which ties the purchase of rights to copyrighted motion pictures to purchase of other motion pictures of the same copyright holder, the Court did not analyze the arrangement with the schema of the tying cases. Rather, the Court borrowed the patent law principle of "patent misuse," which prevents the holder of a patent from using the patent to require his customers to purchase unpatented products. *Id.,* at 156–159. See, *e. g., Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661, 665 (1944). The "patent misuse" doctrine may have influenced the Court's willingness to strike down the arrangement at issue in *International Salt* as well, although the Court did not cite the doctrine in that case.

U. S., at 396.   If, on the other hand, the tying arrangement is likely to erect significant barriers to entry into the tied-product market, the tie remains suspect.   *Atlantic Refining Co.* v. *FTC*, 381 U. S. 357, 371 (1965).

Third, there must be a coherent economic basis for treating the tying and tied products as distinct.   All but the simplest products can be broken down into two or more components that are "tied together" in the final sale.   Unless it is to be illegal to sell cars with engines or cameras with lenses, this analysis must be guided by some limiting principle.   For products to be treated as distinct, the tied product must, at a minimum, be one that some consumers might wish to purchase separately *without also purchasing the tying product.*[8] When the tied product has no use other than in conjunction with the tying product, a seller of the tying product can acquire no *additional* market power by selling the two products together.   If sugar is useless to consumers except when used with flour, the flour seller's market power is projected into the sugar market whether or not the two products are actually sold together; the flour seller can exploit what market power it has over flour with or without the tie.[9]   The flour seller will therefore have little incentive to monopolize the sugar market unless it can produce and distribute sugar more cheaply than other sugar sellers.   And in this unusual case, where flour is monopolized and sugar is useful only when

---

[8] Whether the tying product is one that consumers might wish to purchase without the tied product should be irrelevant.   Once it is conceded that the seller has market power over the tying product it follows that the seller can sell the tying product on noncompetitive terms.   The injury to consumers does not depend on whether the seller chooses to charge a supercompetitive price, or charges a competitive price but insists that consumers also buy a product that they do not want.

[9] Cf. Areeda, *supra* n. 4, at 735; Ross, The Single Product Issue in Antitrust Tying: A Functional Approach, 23 Emory L. J. 963, 1010 (1974); Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19, 21–23 (1957).

used with flour, consumers will suffer no further economic injury by the monopolization of the sugar market.

Even when the tied product does have a use separate from the tying product, it makes little sense to label a package as two products without also considering the economic justifications for the sale of the package as a unit. When the economic advantages of joint packaging are substantial the package is not appropriately viewed as two products, and that should be the end of the tying inquiry. The lower courts largely have adopted this approach.[10] See, *e. g.*, *Foster* v. *Maryland State Savings and Loan Assn.*, 191 U. S. App. D. C. 226, 228–231, 590 F. 2d 928, 930–933 (1978), cert. denied, 439 U. S. 1071 (1979); *Response of Carolina, Inc.* v. *Leasco Response, Inc.*, 537 F. 2d 1307, 1330 (CA5 1976); *Kugler* v. *AAMCO Automatic Transmissions, Inc.*, 460 F. 2d 1214 (CA8 1972); *ILC Peripherals Leasing Corp.* v. *International Business Machines Corp.*, 448 F. Supp. 228, 230

---

[10] The examination of the economic advantages of tying may properly be conducted as part of the rule-of-reason analysis, rather than at the threshold of the tying inquiry. This approach is consistent with this Court's occasional references to the problem. The Court has not heretofore had occasion to set forth any general criteria for determining when two apparently separate products are components of a single product for tying analysis. In *Times-Picayune Publishing Co.*, the Court held that advertising space in a morning newspaper was the same product as advertising space in the evening newspaper—access to readership of the respective newspapers—because the subscribers had no reason to distinguish among the readers of the two papers. 345 U. S., at 613–616. In *Fortner I*, the Court, reversing the grant of a motion for summary judgment, rejected the contention that credit could never be separate from the product for whose purchase credit was extended. 394 U. S., at 506–507. The Court disclaimed any determination of "the standards for determining exactly when a transaction involves only a single product." *Id.*, at 507. These cases indicate that consideration of whether a buyer might prefer to purchase one component without the other is one of the factors in tying analysis and, more generally, that economic analysis rather than mere conventional separability into different markets should determine whether one or two products are involved in the alleged tie.

(ND Cal. 1978); *United States* v. *Jerrold Electronics Corp.*, 187 F. Supp. 545, 563 (ED Pa. 1960), aff'd *per curiam,* 365 U. S. 567 (1961).

These three conditions—market power in the tying product, a substantial threat of market power in the tied product, and a coherent economic basis for treating the products as distinct—are only threshold requirements. Under the rule of reason a tie-in may prove acceptable even when all three are met. Tie-ins may entail economic benefits as well as economic harms, and if the threshold requirements are met these benefits should enter the rule-of-reason balance.

> "[Tie-ins] may facilitate new entry into fields where established sellers have wedded their customers to them by ties of habit and custom. *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 330 (1962) . . . . They may permit clandestine price cutting in products which otherwise would have no price competition at all because of fear of retaliation from the few other producers dealing in the market. They may protect the reputation of the tying product if failure to use the tied product in conjunction with it may cause it to misfunction. . . . [Citing] *Pick Mfg. Co.* v. *General Motors Corp.,* 80 F. 2d 641 (C. A. 7th Cir. 1935), aff'd, 299 U. S. 3 (1936). And, if the tied and tying products are functionally related, they may reduce costs through economies of joint production and distribution." *Fortner I,* 394 U. S., at 514, n. 9 (WHITE, J., dissenting).

The ultimate decision whether a tie-in is illegal under the antitrust laws should depend upon the demonstrated economic effects of the challenged agreement. It may, for example, be entirely innocuous that the seller exploits its control over the tying product to "force" the buyer to purchase the tied product. For when the seller exerts market power only in the tying-product market, it makes no difference to him or his customers whether he exploits that power by rais-

ing the price of the tying product or by "forcing" customers to buy a tied product. See Markovits, Tie-Ins, Reciprocity and the Leverage Theory, 76 Yale L. J. 1397, 1397–1398 (1967); Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62, 62–63 (1960). On the other hand, tying may make the provision of packages of goods and services more efficient. A tie-in should be condemned only when its anticompetitive impact outweighs its contribution to efficiency.

## III

Application of these criteria to the case at hand is straightforward.

Although the issue is in doubt, we may assume that the hospital does have market power in the provision of hospital services in its area. The District Court found to the contrary, 513 F. Supp. 532, 541 (ED La. 1981), but the Court of Appeals determined that the hospital does possess market power in an appropriately defined market. While appellate courts should normally defer to the district courts' findings on such fact-bound questions,[11] I shall assume for the purposes of this discussion that the Court of Appeals' determination that the hospital does have some power in the provision of hospital services in its local market is accepted.

Second, in light of the hospital's presumed market power, we may also assume that there is a substantial threat that East Jefferson will acquire market power over the provision of anesthesiological services in its market. By tying the sale of anesthesia to the sale of other hospital services the hospital can drive out other sellers of those services who might otherwise operate in the local market. The hospital may thus gain local market power in the provision of anesthesiology: anesthesiological services offered in the hospital's market, narrowly defined, will be purchased only from Roux, under the hospital's auspices.

---

[11] See Fed. Rule Civ. Proc. 52(a); *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 855–858 (1982).

But the third threshold condition for giving closer scrutiny to a tying arrangement is not satisfied here: there is no sound economic reason for treating surgery and anesthesia as separate services. Patients are interested in purchasing anesthesia only in conjunction with hospital services,[12] so the hospital can acquire no *additional* market power by selling the two services together. Accordingly, the link between the hospital's services and anesthesia administered by Roux will affect neither the amount of anesthesia provided nor the combined price of anesthesia and surgery for those who choose to become the hospital's patients. In these circumstances, anesthesia and surgical services should probably not be characterized as distinct products for tying purposes.

Even if they are, the tying should not be considered a violation of § 1 of the Sherman Act because tying here cannot increase the seller's already absolute power over the volume of production of the tied product, which is an inevitable consequence of the fact that very few patients will choose to undergo surgery without receiving anesthesia. The hospital-Roux contract therefore has little potential to harm the patients. On the other side of the balance, the District Court found, and the Court of Appeals did not dispute, that the tie-in conferred significant benefits upon the hospital and the patients that it served.

The tie-in improves patient care and permits more efficient hospital operation in a number of ways. From the viewpoint of hospital management, the tie-in ensures 24-hour anesthesiology coverage, aids in standardization of procedures and efficient use of equipment, facilitates flexible scheduling of operations, and permits the hospital more effectively to monitor the quality of anesthesiological services. Further, the tying arrangement is advantageous to patients because, as the District Court found, the closed anesthesiology depart-

---

[12] While the record appears to be devoid of factual findings on this point the assumption is a safe one, and certainly one that finds no contradiction in the record.

ment places upon the hospital, rather than the individual patient, responsibility to select the physician who is to provide anesthesiological services. The hospital also assumes the responsibility that the anesthesiologist will be available, will be acceptable to the surgeon, and will provide suitable care to the patient. In assuming these responsibilities—responsibilities that a seriously ill patient frequently may be unable to discharge—the hospital provides a valuable service to its patients. And there is no indication that patients were dissatisfied with the quality of anesthesiology that was provided at the hospital or that patients wished to enjoy the services of anesthesiologists other than those that the hospital employed. Given this evidence of the advantages and effectiveness of the closed anesthesiology department, it is not surprising that, as the District Court found, such arrangements are accepted practice in the majority of hospitals of New Orleans and in the health care industry generally. Such an arrangement, which has little anticompetitive effect and achieves substantial benefits in the provision of care to patients, is hardly one that the antitrust law should condemn.[13] This conclusion reaffirms our threshold determination that the joint provision of hospital services and anesthesiology should not be viewed as involving a tie between distinct products, and therefore should require no additional scrutiny under the antitrust law.

## IV

Whether or not the hospital-Roux contract is characterized as a tie between distinct products, the contract unquestionably does constitute exclusive dealing. Exclusive-dealing arrangements are independently subject to scrutiny under § 1 of the Sherman Act, and are also analyzed under the rule of

---

[13] The Court of Appeals disregarded the benefits of the tie because it found that there were less restrictive means of achieving them. In the absence of an adequate basis to expect any harm to competition from the tie-in, this objection is simply irrelevant.

reason. *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U. S. 320, 333–335 (1961).

The hospital-Roux arrangement could conceivably have an adverse effect on horizontal competition among anesthesiologists, or among hospitals. Dr. Hyde, who competes with the Roux anesthesiologists, and other hospitals in the area, who compete with East Jefferson, may have grounds to complain that the exclusive contract stifles horizontal competition and therefore has an adverse, albeit indirect, impact on consumer welfare even if it is not a tie.

Exclusive-dealing arrangements may, in some circumstances, create or extend market power of a supplier or the purchaser party to the exclusive-dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply. In determining whether an exclusive-dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question—the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal. *Standard Oil Co. of California* v. *United States*, 337 U. S. 293 (1949). When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive-dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be substantially procompetitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships.

At issue here is an exclusive-dealing arrangement between a firm of four anesthesiologists and one relatively small hos-

pital.   There is no suggestion that East Jefferson Hospital is likely to create a "bottleneck" in the availability of anesthesiologists that might deprive other hospitals of access to needed anesthesiological services, or that the Roux associates have unreasonably narrowed the range of choices available to other anesthesiologists in search of a hospital or patients that will buy their services.   Cf. *Associated Press v. United States*, 326 U. S. 1 (1945).   A firm of four anesthesiologists represents only a very small fraction of the total number of anesthesiologists whose services are available for hire by other hospitals, and East Jefferson is one among numerous hospitals buying such services.   Even without engaging in a detailed analysis of the size of the relevant markets we may readily conclude that there is no likelihood that the exclusive-dealing arrangement challenged here will either unreasonably enhance the hospital's market position relative to other hospitals, or unreasonably permit Roux to acquire power relative to other anesthesiologists.   Accordingly, this exclusive-dealing arrangement must be sustained under the rule of reason.

## V

For these reasons I conclude that the hospital-Roux contract does not violate § 1 of the Sherman Act.   Since anesthesia is a service useful to consumers only when purchased in conjunction with hospital services, the arrangement is not properly characterized as a tie between distinct products.   It threatens no additional economic harm to consumers beyond that already made possible by any market power that the hospital may possess.   The fact that anesthesia is used only together with other hospital services is sufficient, standing alone, to insulate from attack the hospital's decision to tie the two types of service.

Whether or not this case involves tying of distinct products, the hospital-Roux contract is subject to scrutiny under the rule of reason as an exclusive-dealing arrangement. Plainly, however, the arrangement forecloses only a small

fraction of the markets in which anesthesiologists may sell their services, and a still smaller fraction of the market in which hospitals may secure anesthesiological services. The contract therefore survives scrutiny under the rule of reason.

The judgment of the Court of Appeals for the Fifth Circuit should be reversed, and the case should be remanded for any further proceedings on respondent's remaining claims. See *ante*, at 5, n. 2.