937 F.2d 603
 1991-1 Trade Cases 69,500
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Mohammad SHAFI, M.D., Plaintiff-Appellant,
v.
ST. FRANCIS HOSPITAL OF CHARLESTON, WEST VIRGINIA, a
corporation, Wilfred K. Wright, individually and as
President of St. Francis, Professional Anesthesia Services,
Incorporated, a corporation, Thomas A. Dickie, M.D.,
individually and as President of Professional Anesthesia
Services, Incorporated, Defendants-Appellees.
Mohammad SHAFI, M.D., Plaintiff-Appellee,
v.
ST. FRANCIS HOSPITAL OF CHARLESTON, WEST VIRGINIA, a
corporation, Wilfred K. Wright, individually and as
President of St. Francis, Professional Anesthesia Services,
Incorporated, a corporation, Thomas A. Dickie, M.D.,
individually and as President of Professional Anesthesia
Services, Incorporated, Defendants-Appellants.
 Nos. 90-3107, 90-3117.
 United States Court of Appeals, Fourth Circuit.
 Argued March 5, 1991.
Decided July 16, 1991.
 
 Appeals from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (CA-88-699-2)
 James Anthony McKowen, Hunt & Wilson, Charleston, W.Va. (Argued), for appellant; Barbara H. Lupton, Hunt & Wilson, Charleston, W.Va., on brief.
 James Ronald Snyder, Jackson & Kelly, William Edward Hamb, Hamb, Poffenbarger & Bailey, Charleston, W.Va. (Argued), for appellees; Edward W. Rugeley, Jr., Jackson & Kelly, Robert W. Kiefer, Jr., Hamb, Poffenbarger & Bailey, Charleston, W.Va., on brief.
 S.D.W.Va.
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 Before K.K. HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and TERRENCE WILLIAM BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Dr. Mohammad Shafi appeals a summary judgment entered against him in his action against his former employer and others, alleging antitrust and pendent state claims. The appellees cross-appeal, offering alternative grounds for affirmance.[1] We affirm in part, but vacate and remand in part for reconsideration in light of an intervening decision of the United States Supreme Court.
 
 I.
 
 2
 Appellant Shafi is a naturalized citizen who was born in Pakistan. From 1975 until March 14, 1986, he was employed as an anesthesiologist at St. Francis Hospital in Charleston, West Virginia. For most of that period, he was head of the anesthesiology department. He began his employment without a written contract. In 1978, however, an accrediting agency required the hospital to have contracts with staff physicians. Shafi entered into three contracts thereafter, in 1978, 1980, and 1982.
 
 
 3
 Shafi objected to the hospital's form contract, especially its terminable-at-will and coterminous (i.e. termination would automatically revoke staff privileges) provisions. On the 1978 contract, he marked through the offending clauses, inserted handwritten replacements of his own, and signed. In 1980 and 1982, however, he merely added a disclaimer--"contingent on continuation of negotiations regarding some clauses which are unacceptable to me." In both 1980 and 1982, Shafi claims that the hospital's then-president, William Shirey, orally agreed to incorporate Shafi's 1978 amendments into the new contract. The 1982 contract would have expired by its terms on July 1, 1987; however, unless the alleged oral modifications were effective, it contained the standard terminable-at-will provision.
 
 
 4
 In 1982, Congress made substantial changes in Medicare in the Tax Equity and Financial Responsibility Act (TEFRA), 26 U.S.C. Secs. 1395 et seq. One key change was a limitation on the amount a hospital could be reimbursed for services such as anesthesia; basically, reimbursement was restricted to the cost of the service. Consequently, many hospitals could no longer recover as large a portion of salaries paid to in-house service providers, and it became common for them to contract with outside entities on a fee-for-service basis.
 
 
 5
 St. Francis was no exception, and, relying on the advice of a consultant, it decided to eliminate its anesthesiology department. The president of St. Francis, appellee Wilfred Wright, had some discussions with Shafi about the move. Shafi and Wright agreed to put off the change until after mid-1985, when Shafi would become vested in a deferred compensation plan.
 
 
 6
 In January, 1986, Shafi had to go to Pakistan to be with his terminally ill father. He asked appellee Dr. Thomas Dickie to substitute for him during his absence.
 
 
 7
 While Shafi was away, the hospital reached an agreement in principle with Dickie whereby Dickie would provide fee-for-service anesthesia, through Dickie's corporation, appellee Professional Anesthesia Services, Inc. ("PAS"). Under the agreement, Dickie would also hold a salaried position at St. Francis as medical director and coordinator of services. On March 4, 1986, Shafi met with hospital president Wright and the hospital's attorney. They told Shafi that he had to agree to work on a fee-for-service basis. A proposed contract was sent to Shafi's attorney for review. This contract contained the same provisions with which Shafi had previously been dissatisfied.
 
 
 8
 On March 6, 1986, Shafi wrote a letter to appellee Wright. He stated that he was opposed to the fee-for-service concept, but that he would agree to the change provided he could form a group with an associate. Wright responded on March 10 that the hospital intended to contract with Dickie, but was still willing to contract with Shafi as well. He also stated that the hospital would convert to the new system on March 17. Shafi's undated response was a handwritten letter, again questioning the wisdom of fee-for-service and objecting to clauses in the proposed contract.
 
 
 9
 On March 11, the hospital and Dickie entered into a written contract. Dickie objected to the terminable-at-will and coterminous provisions, just as Shafi had, and the hospital agreed to delete them from Dickie's contract.
 
 
 10
 The next day, Shafi met one last time with Wright and the hospital's counsel. He again expressed objections to the contract and to fee-for-service. Wright informed Shafi that the hospital was through negotiating, and he was being terminated immediately. Along with the termination, and pursuant to the coterminous provision on the face of the 1982 contract, the hospital revoked Shafi's staff privileges.
 
 
 11
 On April 16, 1986, Shafi sued St. Francis in state court alleging breach of contract and intentional infliction of emotional distress. On April 24, the state court entered a preliminary injunction requiring St. Francis to reinstate him. This injunction was stayed by the West Virginia Supreme Court of Appeals on September 10, 1986.
 
 
 12
 The state court entered summary judgment for the hospital on the emotional distress count, but the action went to trial on breach of contract claim in August, 1988. A jury awarded Shafi $251,000, plus interest, in lost wages, but refused to award anything for "lost bargaining power." The hospital appealed to the West Virginia Supreme Court of Appeals.
 
 
 13
 While the state action was pending, Shafi sought the assistance of appellees in gaining employment. In September or October, 1986, Shafi requested a letter of recommendation from St. Francis to Charleston Area Medical Center (CAMC). St. Francis advised CAMC that it was in litigation with Shafi and gave its reason for terminating him--his refusal to accept the fee-for-service arrangement. In January, 1987, St. Francis turned down Shafi's request for reinstatement of staff privileges. Finally, in April, 1988, Dickie was to be absent from his practice, and he asked a locum tenens (temporary services) group to provide an anesthesiologist during his absence. The group asked whether Shafi would be acceptable, and Dickie replied that he would not.
 
 
 14
 All major hospitals in the Charleston area have exclusive contracts with groups of anesthesiologists, and membership in a group is a de facto prerequisite to regular employment. Shafi was able to get only scattered work, some of it as a temporary employee outside of West Virginia. His only quasi-permanent work was a position at tiny South Charleston Community Hospital, where he was paid less than half of his St. Francis salary. Despairing of ever breaking back into the local market, he has now returned to Pakistan.
 
 
 15
 Shafi brought this suit on May 20, 1988, against the hospital, Wright, Dickie, and PAS. His federal claims were a Sherman Act Sec. 1 litany--conspiracy to restrain trade, boycott, exclusive dealing, and tying. He appended state claims for tortious interference with business relationships and civil conspiracy.
 
 
 16
 After discovery, on November 1, 1989, the defendants moved for summary judgment. The district court granted the motion on June 26, 1990, and Shafi appeals.
 
 
 17
 Less than a month after the district court's order, on July 16, 1990, the West Virginia Supreme Court of Appeals reversed Shafi's state court victory. In a per curiam opinion, the court held that the parol evidence rule barred admission of Shafi's critical evidence that the written 1982 contract had been orally amended. Shafi v. St. Francis Hospital, 396 S.E.2d 181 (W.Va.1990). Though the court remanded, Shafi agreed to voluntarily dismiss the case because he had no chance of winning it without the extrinsic evidence.
 
 II.
 A.
 
 18
 Among his various antitrust theories, Shafi argues that the hospital's exclusive contract with PAS constitutes illegal "tying" of the purchase of anesthesia to the purchase of hospital services. This claim is easily rejected.
 
 
 19
 The leading case on tying arrangements, Jefferson Parish Hospital District v. Hyde, 466 U.S. 2 (1984), involved quite similar facts. An anesthesiologist who was unable to practice at a hospital because of an exclusive contract with a group of anesthesiologists sued the hospital and alleged an illegal tying arrangement. The defendant hospital had a 30% share in the local hospital services market. The Supreme Court held that the Sherman Act was not violated because the hospital did not have sufficient power in the tying market (hospital services) to disrupt competition in the tied market (anesthesia).
 
 
 20
 Jefferson Parish's reasoning applies forcefully here. Even if, as appellees do not concede, the relevant market is the Kanawha Valley, and not some larger geographical area, St. Francis has only an 11% market share.[2] St. Francis simply lacks the power in the hospital market to restrain trade in the "tied" anesthesia market. Shafi argues that his case is different because all major hospitals in the Kanawha Valley have exclusive contracts with groups like PAS. This argument is inconsistent with the tying theory. If Shafi wants to sue all of the hospitals for a conspiracy to restrain trade, he may, but he has not. He has sued St. Francis for using its hospital services market power to disrupt the anesthesia market. Because Shafi submitted no competent evidence that St. Francis is capable of doing any such thing, summary judgment on the tying claim was proper.
 
 B.
 
 21
 Shafi also advanced a Sherman Act claim objecting to the hospital's "exclusive dealing" with Dickie and PAS. Shafi alleged in his state-court action that he was formerly the exclusive provider of anesthesiology at St. Francis; he may not now complain that someone else enjoys a similar position. Replacement of one exclusive contractor with another is not a violation of the antitrust laws. Steuer v. National Medical Enterprises, 672 F.Supp. 1489 (D.S.C.1987).
 
 C.
 
 22
 Another antitrust theory advanced by Shafi is that the Hospital and Dickie combined and conspired to restrain trade by excluding him from practice at the Hospital (and therefore the Kanawha Valley). Shafi also characterizes this theory as a "group boycott." The centerpiece of Shafi's evidence is the addendum to the contract between Dickie and the Hospital, which reads:
 
 
 23
 That Dr. Mohammad Shafi and/or any group, partnership or corporation to which he is affiliated, along with other anesthesiologists in said group, partnership or corporation who obtain staff privileges at the Hospital, are hereby specifically excluded from the provisions of paragraph 6 of [the contract].
 
 Paragraph 6 states:
 
 24
 OTHER ANESTHESIOLOGISTS. Hospital shall maintain a staff consisting of anesthesiologists associated with PAS and other anesthesiologists who presently have staff privileges at the hospital. PAS shall make the equipment and facilities of the Hospital, exclusive of CRNAs [certified registered nurse anesthetists], available at reasonable times for use by such specialists in the field of Anesthesiology who are members of the staff of the Hospital. It is understood between the Hospital and PAS that any patient or attending physician of any patient may request a specialist in Anesthesiology presently having staff privileges, other than those associated with PAS, to personally administer an anesthetic so long as such specialist is a member in good standing on the Medical Staff of the Hospital. For any individual anesthesiologist, other than those associated with PAS, to provide such services, the attending physician shall cause the operating room personnel to post the name of such individual anesthesiologist for that case on the posting sheet. If a specialist in Anesthesiology who has staff privileges at the Hospital is so designated, such shall be honored by Hospital and PAS.
 
 
 25
 Shafi touts the addendum as direct evidence of a conspiracy. The addendum was made on March 11, 1986, while Shafi had an open offer to contract from the hospital, and the appellees argued below that the addendum was simply intended to allow Dr. Shafi to use CRNAs if he accepted the fee-for-service contract, notwithstanding PAS' paragraph 6 right to not provide CRNAs to non-PAS anesthesiologists. Both of the parties' interpretations of these two provisions have flaws. The addendum simply has no plain meaning. The district court found the hospital's interpretation "persuasive"; however, because it had to view the evidence on a motion for summary judgment in a light most favorable to Shafi, it ruled that the language was ambiguous enough to preclude summary judgment on the existence of a conspiracy.
 
 
 26
 The district court found another element on which it felt summary judgment was appropriate, however. Shafi failed to provide evidence of restraint of trade or of even the market he alleges was restrained. As the district court put it, "[f]ailure to identify the relevant market and to provide significant probative evidence as to the adverse effect on competition is ... fatal to the totality of plaintiff's antitrust claims."
 
 
 27
 Recently, after argument of this appeal, the Supreme Court decided Summit Health, Ltd. v. Pinhas, 59 U.S.L.W. 4493 (May 28, 1991), which places the district court's reasoning in some doubt. The summary judgment for the appellees on the conspiracy/group boycott claim is vacated, and the case is remanded for reconsideration in light of Summit Health.
 
 III.
 A.
 
 28
 The district court held that Shafi's state-law tortious interference claim against St. Francis and its president Wright was barred by res judicata. This ruling is undoubtedly correct. St. Francis and Shafi were the parties in the state breach-of-contract suit, the operative facts of the two cases are identical, and nothing prevented Shafi from alleging a tortious interference with business relationships claim in the prior action. Thus, all elements of a res judicata defense are established. Hannah v. Beasley, 132 W.Va. 814, 53 S.E.2d 729, 732 (1949). All of Wright's allegedly tortious actions were taken in his capacity as president of St. Francis, as indeed all "actions" of St. Francis were actually performed by Wright. Hence, Wright is in privity with St. Francis so as to share its res judicata defense. Restatement (Second) of Judgments Sec. 51; cf. Willigerod v. Sharafabadi, 151 W.Va. 995, 158 S.E.2d 175 (1967) (judgment for servant absolves master in subsequent suit on same facts).
 
 
 29
 Dickie and PAS were granted summary judgment on the tortious interference claim for a different reason. An element of a tortious interference with business relationships claim is that the interferer must be outside the relationship. Torbett v. Wheeling Dollar Savings & Trust Co., 314 S.E.2d 166, 173 (W.Va.1983). The only alleged tortious act of Dickie and PAS that occurred within the applicable limitations period[3] was Dickie's refusal to allow Shafi to substitute for him during his absence. As the district court ruled, Dickie and PAS were principals to this proposed business transaction, not outsiders; therefore, an essential element of tortious interference was absent.
 
 B.
 
 30
 In the district court, the state "civil conspiracy" claim then fell of its own weight. Civil conspiracy is not a tort in and of itself; it cannot exist in the absence of some other underlying wrong. Dixon v. American Industrial Leasing Co., 162 W.Va. 832, 253 S.E.2d 150, 152 (1979). Inasmuch as all of Shafi's other claims had been rejected, the district court concluded that the civil conspiracy count must also fail. This defect would disappear if Shafi's remanded antitrust theories prove viable. Therefore, the summary judgment on Shafi's civil conspiracy claim is also vacated, and it may be pursued on remand.
 
 
 31
 In summary, the judgment on Shafi's antitrust conspiracy/group boycott and common-law civil conspiracy claims is vacated, and the case is remanded for reconsideration in light of Summit Health, Ltd. v. Pinhas, 59 U.S.L.W. 4493 (May 28, 1991). In all other respects, the judgment below is affirmed.
 
 
 32
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 The cross-appeal was unnecessary, inasmuch as we can affirm for any reason appearing on the record. Blum v. Bacon, 457 U.S. 132, 137 n. 5 (1982)
 
 
 [2]
 The 11% figure was proved by the affidavit of St. Francis' Vice President for Finance, and is not disputed by Shafi
 
 
 [3]
 The parties dispute whether the applicable period is one or two years, see W.Va.Code Sec. 55-2-12 (1981), but the tussle is irrelevant--the only act of Dickie or PAS within either limitations period is the April, 1988, locum tenens incident