## CAJUN ELECTRIC POWER COOPERATIVE, INC., Petitioner,

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Arkansas Electric Entergy Consumers, Louisiana Public Service Commission, Mississippi Public Service Commission, City of Benton, City of North Little Rock, Arkansas, City of Osceola, Arkansas, City of Prescott, Arkansas, The Conway Corporation, West Memphis Utilities Commission, Farmers Electric Cooperative Corporation, City of Lafayette, Louisiana, South Mississippi Electric Power Association, Municipal Energy Agency of Mississippi, Entergy Services, Inc., Intervenors.

Nos. 92–1461, 92–1470, 92–1489, 92–1491, 92–1497, 92–1522, 92–1523, 92–1526.

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 1994.

Decided July 12, 1994.

---

Rock, AR (for Arkansas Cities and Co-op.), Wallace E. Brand and Sean T. Beeny (for Louisiana Energy and Power Authority), Thomas L. Rudebusch and Richmond F. Allan (for Cajun Elec. Power Co-op., Inc.), Daniel J. Guttman, Jr. (for City of Lafayette, Louisiana), and Robert Weinberg, Washington, DC (for South Mississippi Elec. Power Ass'n).

Earle H. O'Donnell, Washington, DC (for BP Oil Co. and Occidental Chemical Corp.) argued the cause for the retail customer petitioners. With him on the briefs were Mitchell F. Hertz (for Arkansas Elec. Entergy Consumers), and Lynn N. Hargis and Robert F. Shapiro, Washington, DC (for American Forest and Paper Ass'n).

Randolph L. Elliott, Atty., Federal Energy Regulatory Com'n ("FERC" or the "Commission"), Washington, DC, argued the cause for respondent. With him on the brief were Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., FERC, Washington, DC. Samuel Soopper, Attorney, FERC, Washington, DC, also entered an appearance for respondent.

Floyd L. Norton IV, Washington, DC, argued the cause for intervenor Entergy Services, Inc. With him on the brief were William M. Dudley, Glen S. Bernstein, Washington, DC, and J. Wayne Anderson, New Orleans, LA. Don P. Garber, New Orleans, LA, also entered an appearance for intervenor Entergy Services, Inc.

Michael R. Fontham and Noel J. Darce, New Orleans, LA, were on the brief for intervenor Louisiana Public Service Com'n.

Appearances were filed by James D. Senger (for Arkansas Electric Entergy Consumers), Bonnie S. Blair, Washington, DC (for Municipal Energy Agency of Mississippi), Charles L. Schlumberger, Little Rock, AR (for Arkansas Elec. Co-op. Corp.), George M. Fleming, Houston, TX (for Mississippi Public Service Com'n), Carl W. Ulrich, Washington, DC (for Northern Distributor Group, et al.), Stuart W. Conrad, Kansas City, MO (for Midwest Gas Users' Ass'n), and Mark R. Haskell, Katherine B. Edwards, Gordon Gooch, Washington, DC and Fredrick T.

James D. Pembroke, Washington, DC (for Cajun Elec. Power Co-op., Inc.) argued the cause for the wholesale customer petitioners. With him on the briefs were N.M. Norton, Jr., Little Rock, AR (for Arkansas Elec. Co-op. Corp.), Zachary D. Wilson, North Little

Kolb, Houston, TX (for Amoco Production Co.).

Before MIKVA, Chief Judge, and SILBERMAN and BUCKLEY, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

Cajun Electric Power Cooperative, Inc., and other wholesale and retail customers of Entergy Corporation (Entergy) petition for review of three electric power tariffs filed by Entergy and approved by the Federal Energy Regulatory Commission. Two of these provided for the sale of wholesale power by Entergy at negotiated, market-based rates—as opposed to conventional cost-based rates—while the third was intended to mitigate Entergy's market power by providing open access to its transmission system. In combination, they were designed to permit Entergy—a monopolist of transmission services in the relevant market—to engage in market-based pricing in the generation market, while simultaneously introducing competition to that market through the unbundling of generation sales from transmission services. Along with the filing, Entergy submitted a market study designed to persuade the Commission that upon acceptance of the tariffs, Entergy's market power would in fact be mitigated. The Commission approved the tariffs without holding hearings.

■ The record reveals disputed issues of material fact concerning the impact of the "open-access" transmission tariff on Entergy's market power. We find that the Commission failed to adequately address these and other concerns raised by the petitioners and conclude that it was arbitrary and capricious in declining to conduct hearings.[1] We grant the petition and remand for reconsideration consistent with this opinion.

## I. BACKGROUND

Entergy is a public utility holding company, whose various wholly-owned subsidiaries collectively deal in both the transmission and generation of electric power. On August 2, 1991, one of its subsidiaries, Entergy Services, Inc., submitted three tariffs to the Commission for approval pursuant to section 205 of the Federal Power Act. See 16 U.S.C. §§ 824d, 824e (1988). Two were rate schedules which provided for the wholesale sale of power at negotiated, market-based rates. These represented a departure from the regulated, cost-based rates that Entergy was then applying. The third tariff was a rate schedule which purported to provide open access to Entergy's transmission system. This transmission service tariff (TST) provided that any eligible electric utility could purchase transmission service over Entergy's lines at cost-based rates. It also included a provision under which Entergy could recover its "stranded investment costs," which are the costs Entergy incurs due to any surplus in generation (or other) facilities resulting from the introduction of open access to its transmission services; i.e., Entergy's current customers might take advantage of open access to purchase power from competing entities and thereby leave Entergy with excess capacity and the costs which that entails. Entergy's filing—although lengthy—was not supported by either testimony or affidavits.

On August 13, 1991, the Commission issued notice of Entergy's filing and advised persons who wished to intervene or protest to do so by August 26. Although the notice was not published in the Federal Register until August 20, 56 Fed.Reg. 41,338 (1991), the petitioners timely filed motions to intervene and protest Entergy's filing and requested that the Commission conduct an evidentiary hearing. From August 26, 1991, until March 3, 1992, the Commission remained silent. On the latter date, it entered an order denying the requests for an eviden-

---

1. The parties expend considerable energy briefing the issue of what must be proffered in a motion to intervene or protest. See 18 C.F.R. § 385.214(b) ("motion to intervene must state, to the extent known, the position taken by the movant and the basis in fact and law for that position"). We do not reach the issue of the precise threshold required by § 385.214, however, since we think the petitioners clearly surpassed whatever § 385.214 might require by indicating the substantial controversy—and, ultimately, the flawed analysis—associated with the stranded investment provision alone, see infra.

tiary hearing and declared for the first time its intention to resolve all material facts in dispute from the written record. It approved the rate filings, albeit with significant modifications. *See Entergy Services, Inc.,* 58 F.E.R.C. ¶ 61,234 (1992); *Entergy Services, Inc.,* "Order on Rehearing," 60 F.E.R.C. ¶ 61,168 (1992). It also subsequently chastised the petitioners for failing to proffer evidence in their motions to intervene and protest in support of their contentions. *Id.* at 61,167.

## II. DISCUSSION

The critical issue in this case involves Entergy's move from regulated to market pricing for its wholesale sales of electric power. As both parties agreed at oral argument, the primary source of Entergy's market power in generation sales is its bottleneck monopoly in transmission services.[2] Given this market power, a classic tying problem exists: Entergy could use its monopoly over transmission services to eliminate competition in the market for generation services. *Cf. Eastman Kodak Co. v. Image Technical Services,* — U.S. —, —, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992) ("A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier,'" and is illegal under the Sherman Act "if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.") (citations omitted).

When faced with these kinds of concerns, FERC only approves market-based rates when a utility demonstrates that its market power is sufficiently mitigated in the relevant markets. *See, e.g., Western Systems Power Pool,* 55 F.E.R.C. ¶ 61,099 at 61,316 ("allowing departure from cost-based rates to market-pricing in which parties could trade under a market-priced arrangement only after demonstrating that there was either no mar-

ket power, or that such market power had been mitigated"); *Elizabethtown Gas Co. v. F.E.R.C.,* 10 F.3d 866, 870 (D.C.Cir.1993) ("when there is a competitive market the FERC may rely upon market-based prices in lieu of cost-of-service regulation to assure a 'just and reasonable' result") (citation omitted). Hence, the core question here is whether the open-access transmission tariff truly mitigates Entergy's market power; accordingly, FERC approved Entergy's tariffs only after concluding that Entergy "will not dominate generation in any relevant market" and "will have adequately mitigated its market power in transmission" after having implemented the TST. 58 F.E.R.C. ¶ 61,234 at 61,754.

In declining to hold a hearing or request additional evidentiary submissions before rendering its decision, FERC concluded that the petitioners had not demonstrated in their intervention motion that there were any genuine issues of material fact that required a trial-type hearing. *See* 58 F.E.R.C. ¶ 61,234 at 61,772 (1992); 60 F.E.R.C. ¶ 61,168 at 61,617 (1992). FERC believed that by granting competitors access to Entergy's transmission services, the TST would "provide sufficient assurance that Entergy will not exercise market power under the new tariffs." 60 F.E.R.C. ¶ 61,168 at 61,619. The idea was that "open access" to Entergy's transmission grid would effectively mitigate production-related market power. To facilitate this result, FERC modified Entergy's proposed TST. For example, FERC required Entergy to file all transmission service requests with FERC, to maintain an electronic bulletin board of available transmission capacity and requests for transmission service, and to submit an updated market analysis every three years. *Id.* FERC also permitted customers to file complaints under section 206 of the Federal Power Act if they believed that Entergy was exercising market power. *See id.* Finally, FERC also required that any stranded investment costs levied against users of Entergy's transmission grid be "legitimate and verifiable." 60

---

**2.** *See* 58 F.E.R.C. ¶ 61,234 at 61,759 ("The Commission's conclusion that Entergy will not be a dominant supplier of generation services in the relevant markets depends on Entergy being un- able to use its control of transmission facilities to block prospective buyers' access to alternative generation sources.").

F.E.R.C. ¶ 61,168 at 61,631. Satisfied with these adjustments, FERC declined to conduct hearings on the TST, and maintained that a "hearing would only speculate about what Entergy might do in the future." *Id.* at 61,619.

 In general, FERC must hold an evidentiary hearing "only when a genuine issue of material fact exists," *Vermont Dept. of Public Service v. F.E.R.C.,* 817 F.2d 127, 140 (D.C.Cir.1987), and even then, "FERC need not conduct such a hearing if [the disputed issues] may be adequately resolved on the written record." *Moreau v. F.E.R.C.,* 982 F.2d 556, 568 (D.C.Cir.1993). Moreover, "mere allegations of disputed fact are insufficient to mandate a hearing; a petitioner must make an adequate proffer of evidence to support them." *Woolen Mill Ass'n v. F.E.R.C.,* 917 F.2d 589, 592 (D.C.Cir.1990). We review FERC's decision to deny an evidentiary hearing for an abuse of discretion. *Woolen Mill,* 917 F.2d at 592. Notwithstanding this deferential standard of review, we conclude that FERC erred in summarily approving Entergy's tariffs.

The petitioners proffered several facts that raise serious doubts concerning the mitigation of Entergy's market power—doubts that FERC has not adequately addressed and upon which an evidentiary hearing may shed light. Although FERC's analysis of Entergy's market power was not cursory, *see* 58 F.E.R.C. ¶ 61,234 at 61,754–60, we think its determination that the TST would sufficiently mitigate Entergy's market power is seriously flawed. The petitioners raised several factual issues which indicate that Entergy might retain significant market power notwithstanding the TST.

The most problematic of these involves the "stranded investment" provision, concerning which the Commission stated as follows:

The Commission believes that Entergy should be able to recover legitimate and verifiable stranded investment costs and that such cost recovery does not constitute the collection of monopoly rents. By filing the open access transmission tariff in this proceeding, Entergy provided an opportunity for wholesale power market participants in its relevant market area to trade with each other more easily. However, this opportunity may result in certain transition problems, such as Entergy's stranded investment. Entergy negotiated its existing power contracts with Captive Cities and Individual Cities when these entities were its full and partial requirements customers respectively. They had limited, if any, options other than purchasing Entergy's generation services. By offering the open access transmission tariff, Entergy has now expanded the supply options available to these customers so that they can, in many cases, purchase their requirements elsewhere as soon as the tariff becomes effective. If Entergy has made investment decisions based on a contractual commitment or a reasonable expectation at that time that it would continue to serve these customers, it should be able to recover from them the legitimate and verifiable costs invested on their behalf.

60 F.E.R.C. ¶ 61,168 at 61,631.

Section 9a of the TST provides that Entergy may recover its stranded investment costs from certain competitors who use its transmission services. *Id.* These costs—which must be generation-related since the customer will be employing Entergy's transmission services in any case—are to be included in the rates charged for the transmission service. *See id.* (permitting Entergy to petition for recovery of any stranded investment costs). In other words, if Entergy loses a customer of generation capacity to a competitor but the customer continues to employ Entergy's transmission grid, the charge for the transmission will include not only costs directly associated with it, but also the cost of Entergy's generation capacity idled by the switch. "[T]he customer's cost liability for stranded investment" is, however, limited to "what the customer would have contributed to fixed costs under its existing rate had the customer remained on Entergy's system." *Id.*

This is, in essence, a tying arrangement, *see Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984) ("the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the

tying product to force the buyer into the purchase of the tied product"), and it might be fine if the purpose of the arrangement were not to cabin Entergy's market power. The Commission argues that this is not a tying arrangement because it "is not a situation in which Entergy is requiring a customer to purchase generation in the future in exchange for transmission in the future." 60 F.E.R.C. ¶ 61,168 at 61,632 (1992). But if a company can charge a former customer for the fixed cost of its product whether or not the customer wants that product, and can tie this cost to the delivery of a bottleneck monopoly product that the customer must purchase, the products are as effectively tied as they would be in a traditional tying arrangement. By analogy, suppose a certain Company A both owned the roads and sold cars. Section 9a of the TST is equivalent to a rule whereby former car customers of Company A, who decide instead to purchase a car from Company B, must pay a toll for road use that covers not only the cost of the road, but also the cost of the displaced productive capacity that would have built the cars they no longer buy from Company A. At any rate, it is hard to imagine that such limited and costly access to the "roads"—that is, to Entergy's transmission grid—will serve to effectively mitigate its market power, especially in the context of electricity generation where fractions of a cent per kilowatt hour can make the difference among competitors.

Permitting a transmission monopolist to impose generation-related charges on competitors who seek only transmission services may actually serve to increase the entity's market power, for it creates an odd asymmetry. That is, while Entergy can compete for generation sales outside its transmission grid without concern for a stranded investment charge, Entergy's competitors cannot compete for the customers on its transmission system on the same basis.

As a theoretical matter, then, the petitioners would appear to be correct that the stranded investment provision is anti-competitive. The Commission admitted as much at oral argument stating "if you're charged these costs, there's some dampening of competition ... I cannot deny that." The question of how much competition in fact is dampened goes to the heart of the complicated issues the Commission faces in these tariffs. The petitioners adequately flagged this issue for the Commission as a specific disputed material issue of fact. We think that there should have been an evidentiary hearing to address it.

The Commission attempted to avoid the issue altogether by declaring that decisions on stranded investment will be made on a case-by-case basis. See 60 F.E.R.C. ¶ 61,168 at 61,617–18, 61,630–33. It argued that the issue is raised "prematurely," 61 F.E.R.C. ¶ 61,168 at 61,617, since "[a]ffected parties may challenge Entergy's recovery of such costs in the particular cases in which they are claimed." Id. at 61,618. Moreover, the Commission prescribed "procedures in conjunction with a particular stranded investment charge, so that a potential transmission customer will know the potential stranded investment for which the customer might be liable and will be able to assess whether to contract for new generation service from another supplier." 60 F.E.R.C. ¶ 61,168 at 61,631. The Commission described the procedures as follows:

> Entergy shall provide, within thirty days of a request for transmission service, the specific stranded investment charge, if any, which Entergy would propose to charge the requester. If a requester finds the proposed stranded investment charge unreasonable, the requester shall have thirty days in which to respond to Entergy, explaining why it disagrees with the charge. Entergy and the requester shall then have ninety days to attempt to resolve the dispute. If Entergy and the requester have not resolved the matter after ninety days, the requester may: (1) file the dispute directly with the Commission for resolution ... or (2) wait until the proposed stranded investment charge is filed as part of Entergy's proposed transmission rate under section 205 of the FPA, and contest at that time.

Id. at 61,631–32.

In short, the Commission argues that the issue of whether stranded investment cost will reduce access to transmission is not sus-

ceptible of final resolution by a hearing at this point, because legitimate and verifiable stranded investment can only properly be determined on a case-by-case basis and appropriate procedures have been made available for doing just that.

But central to the Commission's approval of the tariffs was its finding that Entergy's market power would be mitigated by the TST upon its implementation. 58 F.E.R.C. ¶ 61,234 at 61,759. It follows that the question of whether Entergy's recovery of stranded investment cost precludes mitigation of its market power must be faced squarely by the Commission *at this juncture*. The provision of procedures to determine stranded investment cost on a case-by-case basis at a later date is no answer if the provision has a present anticompetitive effect. Assurances that stranded investment cost is legitimate, verifiable and accurately calculated do not in themselves resolve whether the imposition of such production-related costs on transmission services precludes the mitigation of Entergy's market power.

Moreover, the procedures themselves hang over any prospective deal like the sword of Damocles. To be forced to litigate to determine the price of a product introduces deal-killing transactional costs and uncertainties. If Entergy claims a stranded investment cost that a customer finds unreasonable, it will be at least 150 days (30 + 30 + 90) before the Commission even receives the complaint, much less resolves it. *See* 60 F.E.R.C. ¶ 61,-168 at 61,631–32.

What is inescapably before the Commission at this juncture is its validation of the *concept* of stranded investment, because— not surprisingly really—its view on this matter may itself dictate market structure. The Commission must address whether the TST's provision of a process for recovery of stranded investment costs is itself a deal killer that, perhaps ironically, precludes genuine open access to Entergy's transmission system. In short, the question that must be asked now is whether the TST allows for *"meaningful* access to alternative suppliers." *Western Systems Power Pool,* 55 F.E.R.C. ¶ 61,099 at 61,317 (1991) (emphasis added).

Petitioners argue that the concept of stranded investment has no meaning in a competitive market, since a surplus of productive capacity can always be readily eliminated simply by lowering price. That is, a price can always be found that is low enough that it increases demand sufficiently to eliminate any excess in productive capacity. In the instant case, Entergy always has the option to reemploy any temporarily unemployed productive resources by making off-system sales at market-based prices. Hence, there really is no such thing as stranded investment, only a failure to compete. Of course, the point of introducing competition is to reap the benefits associated with just such market forces. In this sense, a stranded investment provision is the antithesis of competition.

The Commission suggested at oral argument that if there is no such thing as a legitimate stranded investment cost, then the petitioners have nothing to worry about, since the Commission only permits the recovery of such costs if they are, in fact, legitimate. But if the Commission is wrong at the outset concerning the *possibility* of legitimate stranded investment cost, it is not fair or reasonable to create such a mechanism for recovery. It generates uncertainty over costs that may completely bar competitive transactions, not to mention the expense of the process itself which could also prove to be prohibitive.

Other provisions of the TST may also lessen the mitigation of Entergy's market power. Entergy retains sole discretion to determine the amount of transmission capability available for its competitors' use, 58 FERC at 61,739 (section 7 of the TST provides that Entergy "is the sole judge of transmission availability for a specified transaction"), which may prove problematic in light of the fact that Entergy need only provide "transfer capability ... in excess of that needed to accommodate" its own transmission needs. *Id.* Other provisions of the TST that may restrain competition include the point to point service limitation, the failure to impose reasonable time limits on Entergy's response to requests for transmission service, and Entergy's reservation of the right to cancel

service in certain instances, even where a customer has paid for transmission system modifications.

Taken as a whole, the TST seems to provide Entergy with the means to stifle the very competition it purports to create. We think it plain that there may never be any competition if Entergy decides to open only a slight amount of transmission capability to its competitors. At the very least, Entergy's ability to determine whether and when it has surplus transmission capability creates an uncertainty that impedes competition. Any competitor willing to bear this uncertainty, moreover, is then confronted with another: the potentially high stranded investment costs that it might have to bear in using Entergy's transmission services. No competitor could be but somewhat leery of depending on the TST in light of these concerns.

In sum, the petitioners properly raised the issue of whether Entergy might retain market power notwithstanding the purpose of TST to mitigate such power. In approving Entergy's tariffs without conducting hearings, see 58 F.E.R.C. ¶ 61,234 at 61,772, 60 F.E.R.C. ¶ 61,168 at 61,616, the Commission ignored this important question of fact and thus erred. This issue was central to the Commission's approval of Entergy's tariffs; it simply will not do to assert that questions critical to the market power determination were properly deferred for another day. See 60 F.E.R.C. ¶ 61,168 at 61,619 (expressing confidence in "deal[ing] with a potential [market power] problem if, and when it arises"), and at 61,631 (electing to deal with stranded investment issues in future cases).

The Commission suggests that the stranded investment provision is necessary to lure Entergy into competition: "[a]ny utility would be reluctant to open its transmission system voluntarily if it meant being subjected to self-inflicted stranded investment." 58 F.E.R.C. ¶ 61,234 at 61,770. There are two answers to this. First, while the Commission argues that the stranded investment charge "provides an equitable recovery of costs from the parties for which the costs were incurred," 60 F.E.R.C. ¶ 61,168 at 61,632, this is irrelevant if the tariffs do not mitigate

Entergy's market power sufficiently that the resulting market-based prices will be "just and reasonable" under section 205 of the Federal Power Act. 16 U.S.C. § 824d (1988).

Second, this case may take on a different cast in light of recent amendments to the Federal Power Act. Specifically, the Commission can now *order* transmission services pursuant to the Energy Policy Act of 1992. See 16 U.S.C.A. §§ 824j and 824k (1992). As the legislative history explains:

> [T]he title clarifies FERC's authority to order utilities to provide transmission service. It directs FERC to require wheeling that is in the public interest, maintains system reliability, and serves one or more additional goals—including the promotion of wholesale competition, conservation, efficiency, and the prevention of discriminatory practices. The transmitting utility is entitled to payment for the cost of providing such service, plus a reasonable rate of return.

*Comprehensive National Energy Policy Act: Report of the Committee on Energy and Commerce House of Representatives,* 102d Cong., 2d Sess., Rept. 102–474, Part 1, at 140 (March 30, 1992).

## III. CONCLUSION

In light of the substantial controversies evoked by Entergy's tariff filing, the Commission's failure to conduct an evidentiary hearing was arbitrary and capricious. Moreover, the substantive decision is flawed in that the Commission failed to adequately explain its approval of the stranded investment provision, among others. Accordingly, we grant the petition for review and remand this matter to the Commission to conduct further proceedings.

*So ordered.*